# EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF WISCONSIN

------------------------------------------------------

ESTATE OF SHANNON J. PAYNE, By
its Special Administrator,
CHRISTOPHER MEISEL,

        Plaintiff,

                     Case No. 20-CV-0512

    -vs-

DANE COUNTY; SHERIFF DAVID J.
MAHONEY; ABC INSURANCE
COMPANY, and JOHN DOES 1-20,

        Defendants.

------------------------------------------------------

        Examination of KERRY PORTER,

taken at the instance of the Plaintiff, under and

pursuant to the Federal Rules of Civil Procedure,

before ALICE M. BARBELN, a Registered Professional

Reporter and Notary Public in and for the State of

Wisconsin, via Zoom videoconference, on

June 16, 2021, commencing at 9:29 a.m. and concluding

at 12:04 p.m.

1                 A P P E A R A N C E S

2  CADE LAW GROUP, LLC, by
   MR. NATE CADE,
3  4411 North Ardmore Avenue,
   Shorewood, Wisconsin 53211,
4  appeared via Zoom on behalf of the Plaintiff.

5  MUNICIPAL LAW & LITIGATION GROUP, S.C., by
   MR. MATTEO REGINATO,
6  730 North Grand Avenue,
   Waukesha, Wisconsin 53186,
7  appeared via Zoom on behalf of Defendants Dane
   County, Sheriff David J. Mahoney, and John Does
8  1-20.

9

10
                      *  *  *  *  *
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2

Examination:                              Page

3

By Mr. Cade..................................  4

4

5    Exhibits Identified:                   Page

6    Exhibit 1 -  Manual for Dane County Jail........  56
     Exhibit 2 -  Daily Schedule....................  75
7    Exhibit 3 -  Three-Page Document Regarding Paul
                  Tarkenton.........................  78
8    Exhibit 4 -  Part of the Investigation Into the
                  Death of Mr. Payne................  80
9    Exhibit 5 -  Report Prepared By Deputy Matthew
                  Earll.............................  84
10   Exhibit 6 -  Report Prepared By Deputy Reiser...  87
     Exhibit 7 -  Report Prepared By Detective Wiest.  91
11   Exhibit 8 -  Searches of Inmates................  66

12

Disposition Of Original Exhibits:

13

Attached To Original Transcript

14

15

16                     *  *  *  *  *

17

18

19

20

21

22

23

24

25

1              TRANSCRIPT OF PROCEEDINGS

2                 KERRY PORTER, called as a witness

3        herein, having been first duly sworn on oath,

4        was examined and testified as follows:

5        (Exhibit Nos. 1 through 8 were previously

6        marked.)

7                        EXAMINATION

8    BY MR. CADE:

9    Q    Good afternoon, Captain.  Could you please

10        state and spell your name?

11   A    My name is Kerry, K-E-R-R-Y, and last name is

12        Porter, P-O-R-T-E-R.

13   Q    And you are a captain with the Madison -- or,

14        I'm sorry, the Dane County Sheriff's Office?

15   A    Yes, captain of security services and the jail

16        administrator.

17   Q    How long have you been with Dane County?

18   A    I've been with the Dane County Sheriff's Office

19        for almost 24 years in a variety of different

20        capacities, but with the sheriff's office for

21        24.

22   Q    And how long have you been the captain of

23        security services?

24   A    Since September of last year, September of

25        2020.

1  Q   Okay.  I'll get into your work history in a

2      moment.  Captain, have you been deposed before?

3  A   Not that I recall, no.

4  Q   Oh, wow, okay.  So I'm sure you may have gone

5      over this with Matteo, but there is just a few

6      rules for depositions.  One of the first rules,

7      which is more than important because we are

8      doing it by video, is allow me to finish asking

9      the question before you give an answer.  Our

10     reporter here, Alice, is phenomenal, a very

11     good reporter; however, over video, if I start

12     asking questions and you start jumping in and

13     vice versa, it could end up that the transcript

14     gets a little discombobulated, so very

15     important to allow me to finish asking the

16     question before you answer.  The other reason

17     that's important is I might start asking you a

18     question and realize that Matteo, who is a very

19     worthy adversary, is going to likely object, so

20     I might start asking a question, and in the

21     interim, I stop myself and either reframe it or

22     ask you a different question to deal with what

23     I perceive to be an upcoming objection, so very

24     important to allow me to finish asking it

25     completely before you give an answer.

1    A    Okay.

2    Q    Same holds true for -- you were doing some

3         nodding of the head, nothing wrong with that,

4         but if you are answering and you just nod your

5         head, meaning yes, or, you know, I have a

6         sister-in-law that just nods her head like

7         she's listening but she's really not, you might

8         hear me say, "Is that a 'yes'"?  I'm not doing

9         it to be rude.  I just know in the

10        transcript all Alice can put down is witness

11        nods head," and then down the road, we are

12        having this fight over, did Captain Porter nod

13        his head because he meant yes, or was he being

14        just nice to me.  So if you nod your head or

15        you say something like "uh-huh" or "uh-uh," I

16        have to turn around and say, "Is that a 'yes'"?

17        because I want to make sure the transcript is

18        clear.  Having done, you know, 1,500 of these

19        things, I can, in my head, see how it is being

20        typed, fair?

21   A    Fair enough.  Understood, thanks.

22   Q    And as I indicated a moment ago, you also have

23        to be a give a verbal response, so "uh-huh" and

24        "uh-uh" does not cut it.  You'll need to say

25        yes or the answer, or, same thing, I'll say,

1      "Is that a yes" or ask you for a verbal

2      response.

3            If I ask a question that you don't know

4      the answer to or if I'm asking it and you are

5      confused, maybe I'm not putting it in the right

6      lingo or jargon or something like that, let me

7      know.  I'll try to rephrase.  If I cannot

8      rephrase or fix it, Matteo and I will put our

9      heads together over the internet and maybe we

10     can figure out a question for you to answer

11     that's put to you, fair?

12  A  Fair.

13  Q  If for whatever reason you need to take a

14     break, something comes up at the office,

15     bathroom, whatever, I have no problem taking

16     breaks.  I'm hopeful this will only go a couple

17     of hours, but if you need to take a break,

18     please answer the question that's pending

19     before you take a break.  I don't like to take

20     a break and have a question just sitting out

21     there, fair?

22  A  Fair.

23  Q  And, finally, for purposes of this deposition,

24     I will assume that if you gave a response to a

25     question, you understood the question being

1    posed to you, fair enough?

2  A   Fair enough, yes.

3  Q   So let's go back to where we were.  You had

4       been -- indicated that you had been in your

5       position since September of 2020, and you have

6       been with Dane County for -- the sheriff's

7       office for 24 years.  Prior to that assignment,

8       what was your prior assignment?

9  A   Prior assignment, I was lieutenant in charge of

10      our detective bureau, so investigations

11      lieutenant.

12 Q   And is that investigations internal, external,

13      or both?

14 A   That would be just external in our field

15      services division for our detective bureau, so

16      just external.

17 Q   Great, and how many, as lieutenant of the

18      detective bureau, were you the only lieutenant,

19      or did you share duties with one a day, one a

20      night lieutenant?

21 A   No, just me, and I had a sergeant in the

22      detective bureau that worked under me, and 27

23      detectives.

24 Q   So everything from homicides, drugs, things of

25      that nature?

1    A    Correct.

2    Q    And how long were you a lieutenant of the

3         detective bureau?

4    A    Approximately three-and-a-half years.

5    Q    And prior to that, where were you?

6    A    I was the records custodian in our support

7         services division.

8    Q    That was a crappy job, I bet.

9    A    It was, and I was a lieutenant there as well.

10   Q    Who did you make mad that got you stuck there?

11   A    It was actually a very good learning

12        experience.  At times it was not an enjoyable

13        assignment, but it was a good learning

14        experience.

15   Q    Okay.  And how long were you in that position?

16   A    Approximately a year.

17   Q    And before that, where were you?

18   A    I was our second shift officer in charge for

19        the agency, and as a lieutenant as well.

20   Q    What is the second shift officer in charge of,

21        what's that entail?

22   A    So when captains and other lieutenants that are

23        assigned to Monday through Friday or day shift

24        hours leave and go home, it falls on the

25        officer in charge, and so you oversee the --

1  all four divisions as a resource and as the

2  officer that would make final decisions.  We

3  would have supervisors that would be specific

4  to each division, but as the officer in charge,

5  they would refer to you for supervision.

6  Q  And I'm assuming that you were second shift, so

7     you were the only full OIC for second shift,

8     but there would be an OIC for first shift, one

9     through third?

10  A  Correct.

11  Q  And how long in that position?

12  A  Longer than five years.  I think it was between

13     five and six years.

14  Q  Any education post high school?

15  A  Yes.  I have a bachelor's degree in

16     criminology.

17  Q  From?

18  A  University of Southern Maine.

19  Q  Are you from Maine?

20  A  I am, born and raised.

21  Q  Wonderful area.  I went to high school out

22     East, so I love that area.

23         Other than the bachelor's degree from

24     Southern Maine, anywhere else?

25  A  It isn't a degree, but I'm a graduate of FBI

1         National Academy.

2    Q    Any other post secondary education other than

3         the, you know -- I know you go through training

4         and all that stuff, so I'm not dealing with

5         that stuff, but anything else that they

6         formally hand you a piece of paper outside of

7         the sheriff's department?

8    A    No.

9    Q    So, Captain, we are here due to the death of

10        Shannon Payne on December 27, 2016.  Are you

11        familiar with that?

12   A    I am -- I'm familiar with it only since being

13        advised of the deposition.  I didn't go into

14        great detail and go through all of the reports

15        to get a significant -- but I wanted to have at

16        least a baseline understanding of the case

17        itself, so, yes, very recently it has become my

18        understanding at least in a general way of

19        Shannon Payne's case.

20   Q    Okay.  So I'm going to ask you some questions,

21        and then from there, I might show you some

22        documents.  So walk me through, since you are

23        the captain of security services and jail

24        administration, a person is arrested or there

25        is a probation hold, whatever, they come into

1      the jail, so whether it's a sheriff's deputy

2      that brings them in, maybe a police officer

3      from the City of Madison or one of the

4      surrounding entities or even probation agent,

5      they bring them to the jail for you to hold,

6      the jail to hold.  What steps occur after that?

7              MR. REGINATO:  I would object to

8      form, also foundation.

9              MR. CADE:  You can answer.

10             THE WITNESS:  Okay.  So the process

11     -- I'll kind of start at the beginning.  Let's

12     assume it's a street arrest from either our

13     agency or a municipal agency, the subject would

14     be taken into custody, brought to the Dane

15     County Jail.  We have a vehicle sally port that

16     the squad or other transport vehicle would be

17     brought into.  They would then take their

18     arrestee out of the back of the squad and walk

19     them into a search area at the first floor

20     level just inside -- so the doors would close

21     behind them when they go into the vehicle sally

22     port, then somebody would open a slider door

23     for them to come in a search area of the Dane

24     County Jail.

25  BY MR. CADE:

1    Q    Okay.

2    A    We consider that area somewhat unsecure at that

3         point because it's still a search area where we

4         would be checking.  As it existed in 2016, we

5         would be relying on the arresting agency that

6         they have done at least a pat-down search of

7         that person to detect any weapons or anything

8         that might be harmful or not allowed in the

9         jail before they enter, but, at that point,

10        that arrestee would still be in street clothes.

11        Once they are into that search area, our

12        booking deputy would go through a series of

13        paperwork with the names and get the charge

14        information or the hold information or any

15        other type of legal documents for being able to

16        detain the -- their subject.

17   Q    Okay.

18   A    When that is completed and the booking deputy

19        is satisfied they have all the information that

20        they need, all the correct paperwork is filled

21        out, that person then gets changed over into a

22        jail uniform, and we do -- our people here at

23        the jail then conduct a search before entering

24        the secure proper area of the jail.  The

25        booking process then takes place.  There is a

1    booking clerk that gets additional information.

2    We do photographs and fingerprints, and then

3    they are moved to a temporary housing location

4    on the first floor of the jail.

5  Q  Okay.  So if I could break that down, if you

6    don't mind.  First, at some point, did the --

7    in 2016, did the procedure -- or after 2016,

8    did the procedure change, in terms of how the

9    search for the person is brought in change?

10 A  Yes, slightly it did.  We now -- as it exists

11   today, the arresting agency brings that subject

12   into the search area while they are still in

13   the vehicle sally port.  One of our people goes

14   out and conducts a thorough pat-down search at

15   that location before entering the search area.

16        The other thing of significance that

17   has changed today compared to 2016 is we did

18   not at that time have the existence of body

19   scanners.

20 Q  Okay.

21 A  We currently have a body scanner that all of

22   our new detainees go through.  Those were

23   purchased in 2018.

24 Q  And why was a body scanner -- is there more

25   than one?

1  A   There is one in the booking area.  We also have

2      a second one where inmates having Huber

3      privileges or other work release privileges

4      when they return from anyplace outside the

5      confined area of the jail, we also utilize

6      those body scanners when they return.

7  Q   And can you tell me, when those were purchased

8      in 2018, the reason why they were purchased?

9              MR. REGINATO:  Object to foundation.

10             THE WITNESS:  They were purchased as

11     a means to detect contraband and prevent it

12     from coming into the jail.

13  BY MR. CADE:

14  Q   Do you know if there was an issue with

15     contraband prior to the purchase of the

16     scanners such that there was a need to purchase

17     scanners?

18             MR. REGINATO:  Object to foundation

19     and form.

20             THE WITNESS:  The purchase of the

21     body scanners was something that we felt would

22     be a better, less intrusive way of detecting

23     contraband and possibly a more effective way of

24     preventing contraband from entering the jail.

25  BY MR. CADE:

1    Q    Well, let me reframe the question.  In -- prior

2         to 2018, and going over areas of your history,

3         you at least had time as an officer in charge

4         for about five to six years for second shift,

5         correct?

6    A    Correct.

7    Q    And as the officer in charge during that time

8         period, would you have also been the OIC over

9         jail administration?  So if someone were to

10        come into booking, technically you would be,

11        short of a captain or someone else, you would

12        it be highest-ranking person in that process?

13   A    Yes.  I wouldn't be physically present in the

14        jail.  I wasn't physically located there, but

15        if there was a concern that they didn't feel

16        they -- so we would have supervisors that were

17        on all the shifts in the jail, sergeants, so if

18        there was something that came up that the

19        sergeant felt they needed to consult with the

20        lieutenant about, they would -- that would be

21        me.

22   Q    Right, right.  And I'm not insinuating that you

23        had to be the one physically there and doing

24        the searching and all that; what I'm asking for

25        is I'm just trying to figure out if for the

1      time period that you were there -- so if my

2      math is right, that would roughly be 2010 to

3      2015, somewhere in there?

4   A   Yeah, that would be correct.  I was trying to

5      run that through my head too.  That was right

6      about the time I moved in 2016 -- late 2016,

7      maybe it was actually early 2017 when I went to

8      records custodian, but it was right about that

9      time.

10  Q   Okay.  So while you were the OIC during that

11     time period, were there incidents of contraband

12     being snuck into the jail?

13  A   Yes.

14  Q   And correct me if I'm wrong, I would seem to

15     think there are three ways that contraband gets

16     in, and I'm dealing with drugs, not weapons or

17     anything else, not phones, but one would be

18     through an inmate, whether the person is being

19     booked or Huber.  One would be through guards,

20     you know, or corrections officers, deputies,

21     whatever, so employees; and then the third

22     would be if you have any other extraneous

23     outside vendors, say, for example, like a food

24     vendor or a medical vendor, fair?

25  A   I think you are right there, but there are also

1      additional ways that contraband could

2      potentially enter the facility as well.  We are

3      pretty diligent about it, but there have been

4      times that through the mail system or other

5      packaging that comes into the facility.  You

6      had mentioned the outside vendors, but also

7      through visitation.  Of course we have

8      processes that we would want to search and do

9      our best to prevent that, but there is

10     potentially, for mail and exchanges during

11     visitation, like you mentioned outside vendors,

12     new arrests coming into the facility, inmates

13     that are free to come in and out of the

14     facility with Huber privileges or other work

15     relief privileges, but, yeah, so there was a

16     few additional ones, but, yes, you are correct.

17   Q  Okay.  So if I break that down, I'm going to

18     put corrections officers and deputies to the

19     side.  I presume that vendors, whether that's

20     food or medical, et cetera, they are not

21     necessarily searched when they come in; is that

22     a fair assumption?

23   A  They are not -- typically for food, the

24     containers, the food containers and carts and

25     those type of things are searched, but not

1          necessarily the vendors themselves, but we do

2          have a process for jail access which looks at a

3          variety of things, such as arrest history, and

4          we do a basic background check and jail access

5          authorization for those employees to minimize

6          risk, but to answer your question,

7          specifically, no, they are not searched when

8          they come in and out.

9     Q    And the reason I'm saying that is just -- I

10         mean, I know obviously you do security and all

11         that stuff and background, and you don't want a

12         drug dealer being a food vendor because that's

13         just a target-rich environment, but generally

14         when -- when the food vendors come over, it's

15         not like they are getting a pat-down or a strip

16         search or anything like that, fair?

17    A    That is fair.

18    Q    Okay.

19    A    And to clarify a little bit further too, and

20         maybe just semantics, but with vendors, we also

21         -- beyond vendors, we have a number of programs

22         that come in, you know, NA, AA, different types

23         of volunteers that come in for help for

24         reentry, inmate betterment programs, and they

25         don't necessarily get searched each and every

1          time they come in.

2     Q    Sure.  And is it -- all right.  So let's assume

3          -- and I'll come back to going over the issues.

4          Let's assume I'm a brand-new inmate.  I have

5          done wrong.  I've been arrested.  I go through

6          the sally port, and they do the pat-down.

7          After they do the pat-down, whoever brings me

8          in, then the jail issues me a new uniform,

9          correct?

10    A    Correct.

11    Q    And prior to the new uniform or after the new

12         uniform, do they do a strip search?

13               MR. REGINATO:  Object to foundation.

14               THE WITNESS:  The strip search is

15         largely dependent on whether they are sentenced

16         or unsentenced subjects.  We would, in most

17         cases, not be doing a strip search on a new

18         arrestee.

19    BY MR. CADE:

20    Q    Okay.

21    A    That would be -- we would do, and as the policy

22         indicates, in 2016, the portion for that

23         changeover, we would be observing the inmate

24         change from their street clothes into the jail

25         uniform, but it would not be a strip search.

1      If they were a male, they would continue to

2      have on their underwear, possibly a T-shirt,

3      and just change into that uniform, and they

4      would hand us the street clothes.

5    Q   Okay.

6    A   A female would continue to -- if she had a

7      brassiere, underwear, those types of things, so

8      it would not be a strip search as a new arrest

9      that comes into the facility, in most cases.

10   Q   You say "in most cases."  Are there exceptions?

11   A   There are.  Some of those exceptions are a

12      sentenced inmate that is to our facility if,

13      for example, one of our people that were out on

14      work release were to be arrested, and a new

15      charge came in, they would get sentenced and

16      brought to our facility, we would be strip

17      searching them.

18   Q   Sorry, with Zoom, I misheard that.  So someone

19      who has already been sentenced but is out, like

20      probation or something like that, if they come

21      back in, they are considered sentenced?

22   A   Not probation unless they were -- unless they

23      were specifically sentenced to the Dane County

24      Jail to serve sanctions on -- as a sentence.

25      If it was somebody that was out on our

1        electronic monitoring program that's serving a

2        year for an OWI, for example, was to be

3        rearrested and brought into our jail, we would

4        then -- we would likely strip search that

5        person if they were a sentenced inmate.  And

6        there are other circumstances that allow us to

7        strip search someone who is not a sentenced

8        inmate, but it needs to be reasonably

9        articulated why we are -- why we would want to

10       do that strip search, like that we would have

11       an articulable reasonable suspicion that they

12       are concealing contraband, weapons, or other

13       contraband that we would not want in the

14       facility.  So if the arresting officer

15       communicates with one of our deputies that we

16       believe that they are concealing a weapon or

17       contraband and they can articulate why we would

18       -- if they can articulate reasonably why they

19       believe that they're possibly concealing

20       contraband, then there would be a request to a

21       supervisor to approve a strip search.  That

22       supervisor would then scrutinize the request

23       and either approve or deny that request for a

24       strip search for an unsentenced inmate.

25    Q  So if, say, I'm on a probation hold, I'm

1    brought in on a hold, would I be strip

2    searched?

3  A   Not as a straight hold, no.

4  Q   Okay.  But that's someone who has been

5    sentenced, right?

6  A   For our policy -- and our policy indicates

7    specifically that if it's a straight hold, we

8    consider that an unsentenced inmate and treat

9    them as an unsentenced inmate.

10  Q   Okay.  So explain to me -- so in 2018, now,

11    everybody comes through, goes through the

12    scanner, every prisoner; is that correct?

13  A   Correct, unless they indicate they are pregnant

14    and they are female, obviously, with the

15    radiation-type issues with a body scanner, we

16    would do a more traditional pat-down search

17    that we did prior to, but, yes, for the most

18    part, yes, everything that comes in goes

19    through the body scanner.

20  Q   So why then has the policy changed in terms of

21    the -- using the body scan on everybody, other

22    than a pregnant female, if you are now doing

23    someone who is, you know, a new arrestee,

24    someone who is on probation hold, whatever, was

25    there a rationale for why that policy changed,

1      if you know?

2                MR. REGINATO:  Object to foundation

3      and form.

4                THE WITNESS:  Yeah.  I believe we

5      feel that the body scanner is very different

6      than a strip search.  The body scanner is an

7      image, but it's not -- let me see if I can

8      explain.  So the strip search is much more

9      intrusive in nature, and our policies will try

10     to respect the rights and the privacy and the

11     dignity of the person being searched, and it

12     seems much more intrusive for an actual strip

13     search than the body scanner.  The body scanner

14     is very similar to what you would find when you

15     go through TSA at a security checkpoint in the

16     airport.

17  BY MR. CADE:

18  Q   Well, I guess I should have asked this earlier:

19      Do you know, on a given day, on average how

20      many people are not -- ignore the Huber folks

21      for a moment, but just everybody being brought

22      in for booking, sally port, whatever, how many

23      prisoners are coming through on a daily basis?

24  A   It would vary widely day to day, but --

25  Q   Outside of Badger games?

 1   A   Yeah.  You know, I don't know the number.  I

 2       think it would be safe to say more than 30.

 3   Q   Okay.  More than 50 on average or less than 50?

 4   A   I don't know.  On a busy day, likely more than

 5       50.

 6   Q   Prior to -- well, let me ask you this:  Since

 7       the scanners have been in place, have you

 8       detected prisoners coming in trying to conceal

 9       drugs?

10   A   Yes.

11   Q   And prior to the scanners, especially while you

12       were the OIC, did the prison have issues with

13       new inmates -- or new prisoners bringing in

14       contraband drugs?

15   A   I'm sorry, can you repeat that one more time?

16   Q   Sure.  That was not articulate, so I'll

17       rephrase.

18               Prior to the scanners, so prior to

19       2018, did the jail have issues with prisoners

20       bringing in drugs who had not been searched?

21               MR. REGINATO:  Object to form.

22               THE WITNESS:  I guess you would have

23       to define "issues."  Did it ever come in?

24       Probably the answer is yes, and I guess it

25       depends on how you define issues.

1   BY MR. CADE:

2   Q   Okay.

3   A   I will say that I believe we were effective

4       with mitigating contraband from coming into the

5       facility.

6   Q   And how would you have been effective in

7       mitigating contraband from coming into the

8       facility?

9   A   It being detected during the custodial

10      searches.

11  Q   Do you mean pat-downs?

12  A   Correct.  And in the custodial searches, it's a

13      little different than the pat-down as they are

14      changing into the uniforms and handing their

15      personal clothing over, even though we are not

16      strip searching and going beyond that base

17      layer of clothing, that being the underwear, we

18      would still recover contraband as people were

19      attempting to come into the facility with it.

20  Q   Okay.  But you would agree that if you are not

21      doing a strip search prior to 2018, if

22      contraband is in someone's rectum, for example,

23      you wouldn't discover it absent a strip search,

24      fair?

25              MR. REGINATO:  Objection, calls for

1       speculation.

2                  THE WITNESS:  Yes, and with a strip

3       search, even with a strip search, we may not

4       detect contraband coming in the facility if it

5       was in the rectum.

6   BY MR. CADE:

7   Q   Sure.  Are you aware, and especially during the

8       time you were the OIC, of whether strip

9       searches were conducted in which drugs were

10      found in prisoners' rectums or in the scrotum

11      area or something like that?

12  A   Not in the rectums unless it was visible by the

13      naked eye without any type of further being

14      just visible to the naked eye as the person

15      bent over and we could visually see that, but,

16      yes, we did detect contraband during strip

17      searches.

18  Q   And prior to the installation of the scanners,

19      do you know how often that occurred?

20  A   I don't.

21  Q   I'm assuming when you were the OIC, you would

22      be given an alert:  Hey, we did a strip, and we

23      found drugs?

24  A   Yes.  I would usually be notified, and if I

25      wasn't notified, it would be something that

1        would go into the supervisor logs at the end of

2        the shift that would -- and the log is just

3        something that they would -- anything that --

4        noteworthy that occurred during the shift, they

5        would create a log, and so that is passed onto

6        the next shift and for all the supervisors that

7        are not at work to see it later on, so it's

8        kind of a briefing-type information that goes

9        in there.

10  Q    Sure.  And so -- I'm sorry, can you repeat that

11       last part?

12  A    Sure.  That type of information is certainly

13       something that would qualify to go into the

14       briefing log.

15  Q    And so in those five-and-a-half years where you

16       were the OIC, was this finding drugs or

17       contraband as part of a strip search, would it

18       happen at least monthly, once a month on

19       average you would find something?

20  A    I don't know.  It would seem reasonable.

21  Q    And after the drugs were found, was there any

22       sort of after-action report or any sort of

23       post-search report amongst the supervisors and

24       the folks in the know as to, hey, this

25       happened, we need to start looking for drugs in

1          this way, we need to start searching for

2          contraband in that way, anything like that?

3     A    No, not that I'm aware of; however, a strip

4          search does require a report that's titled,

5          "The strip search," so it is queryable

6          information for administration that certainly

7          could look at, so I don't know if that occurred

8          or didn't occur, but the purpose for titling

9          that in a specific way -- titling that in a

10         specific way makes that search easier so we

11         could query that for the number of strip

12         searches we have completed in whatever

13         timeframe you want to look at, and then in the

14         details of the report would be whether they

15         found contraband or didn't find contraband

16         during that strip search.  I don't know that

17         that was done on a routine basis for compiling

18         that information, but that's the purpose of it,

19         and they certainly could do that if they chose

20         to do so.

21    Q    And every time a strip search is done, you say

22         there is a report that's prepared?

23    A    Correct.

24    Q    And would the booking officer, whoever is down

25         there, is that the person doing the report, or

1      is it someone doing the strip search or the

2      sergeant?  Who is preparing the report for the

3      strip search?

4    A   The report is completed by the person who

5      actually does the strip search who completes

6      it.

7    Q   And while you were the OIC, did you have

8      instances where strip searches were done but

9      reports were not prepared, or did you have

10      knowledge of that?

11    A   I did not have knowledge of that, no.

12    Q   So every time a strip search was done, as far

13      as you know as the OIC, there was a report that

14      was subsequently prepared with it?

15    A   Correct.

16    Q   And prior to the scanners, do you know how

17      often daily or weekly strip searches were done?

18      Are we talking 5 times a day, 20 times a day, 1

19      time a day?

20    A   I don't know the answer to that.

21    Q   Okay.  What would you think on a daily or

22      weekly basis would be the number, roughly?

23           MR. REGINATO:  Object, calls for

24      speculation.

25    BY MR. CADE:

1   Q   I'll rephrase.  You indicated that when there

2       is a strip search, there is some sort of log

3       that's created, correct?

4   A   Yes.

5   Q   And that would be something that you would

6       review on your next shift; so if there was a

7       strip search on third shift and first shift,

8       when you start the second shift, you would see

9       this log and be able to look at that, fair?

10  A   No, not exactly.  So a strip search that was

11      conducted that would result in the finding of

12      contraband, that's something that would

13      probably be newsworthy to include into the log.

14      If it was a strip search that was completed

15      that didn't result in locating contraband,

16      that's probably not something that would go

17      into the shift log.

18  Q   Okay.  Would strips be performed on Huber

19      inmates prior to the scanners?

20  A   Yes.

21  Q   So every time they came in, Huber inmates would

22      be strip searched?

23  A   Probably not every time they came back into the

24      facility but on a much more frequent basis.

25  Q   What's the distinction, really, between a new

1           prisoner coming in and a Huber prisoner?

2    A      The sentence status, for the most part.

3    Q      And I apologize.  That was a bad question.

4                 You would agree with me that if

5           someone is out on Huber, that essentially is a

6           privilege that they get to be out during the

7           day before they come into the jail, true?

8    A      True.

9    Q      And if someone is caught doing something wrong

10          while on Huber, they most likely would lose

11          that Huber privilege, right?

12   A      Yes.

13   Q      So is it more likely or less likely that a

14          Huber prisoner would bring in contraband as

15          opposed to a prisoner who was freshly arrested?

16                 MR. REGINATO:  Objection, calls for

17          speculations, lacks foundation.

18                 THE WITNESS:  You know, I don't know

19          if I can answer that.  I don't know.

20   BY MR. CADE:

21   Q      Do you have any sort of statistics -- let me

22          back up.  While you were the OIC, how often did

23          Huber inmates -- did you find contraband on

24          them?  Was that a daily basis or weekly?

25   A      I don't know.

1  Q   How long does it take to do a strip search if

2      it's done proper?

3  A   I would venture to say probably five minutes.

4  Q   And in those five -- well, let me back up.  A

5      booking officer who is dealing with an inmate

6      coming in, if they feel they are busy, are they

7      likely to not do the strip search?  Bad

8      question.

9              Does the booking officer have

10     discretion in terms of whether or not they do a

11     strip search?

12 A   No -- well, again, it's -- it will make a

13     difference on the sentenced versus unsentenced

14     status, but if they are going to do a strip

15     search on a new arrestee that is not a

16     sentenced inmate of ours, then they don't have

17     the discretion other than they may have the

18     discretion that they could ask the supervisor

19     based on, "I have reasonable suspicious to

20     believe that this person may be concealing

21     contraband," whether that be weapons or drugs

22     or other.

23 Q   But if someone is a sentenced prisoner who

24     comes back into the jail, they are to be strip

25     searched 100 percent of the time?



1  A  No, but they would have discretion on whether

2     they choose to do a strip search on that inmate

3     that's coming back that's our sentenced inmate.

4     They don't do it 100 percent of the time but on

5     a much more frequent basis.

6  Q  Right.  And so that's what I'm trying to figure

7     out -- I'm sorry, you cut out.

8  A  They would have that discretion, yes.  On a

9     sentenced inmate coming back to the facility,

10    the deputy would have the discretion of whether

11    they choose to do a strip search or not to do a

12    strip search for that inmate.

13 Q  Okay.  And are they -- well, are there

14    statistics that are kept prior to the scanner

15    in terms of who was working the booking area

16    and how many strip searches they did?  So, you

17    know, Officer Smith or Deputy Smith, you know,

18    would do three a shift; Deputy Jones would do

19    zero or one a shift.  Did you ever have any

20    sort of statistics to figure out if someone was

21    more likely to do a strip search or less likely

22    to do a strip search?

23 A  Not that I'm aware of, but it's definitely

24    easily queryable information.

25 Q  Whether they have done a strip search?

1  A   Correct.

2  Q   Okay.

3  A   How many strip searches have been done and who

4      would be queryable information in our system.

5  Q   Okay.  So is that something that -- do you know

6      whether the person who had your position

7      previously, whether that was ever looked at,

8      you know, for profiling purposes, or maybe one

9      deputy is more sadistic and enjoyed making

10     people take off their clothes and doing a strip

11     search; do you know if that was ever performed?

12 A   I don't know, but that would be more likely on

13     a complaint basis.

14 Q   Okay.

15 A   We may look at something like that, but as a

16     routine, I'm not aware of us seeking out that

17     information.

18 Q   And I think I asked you this, but I want to

19     make sure:  Do you know if the jail ever had

20     statistics in terms of, you know, contraband is

21     subsequently discovered in the jail -- I'm

22     dealing only with drugs -- and whether you

23     looked at whether it was more likely -- whether

24     it was a Huber individual or whether it was a

25     prisoner that comes in through the sally port,

1      did they ever do any sort of analysis as to

2      where the proverbial holes in security are?

3   A  I am not aware of that -- of them seeking that

4      information for those purposes, but it

5      certainly can be done based on the -- my

6      knowledge of our system and our records

7      management system.

8   Q  When you say it can be done, how do you mean it

9      can be done?

10  A  So the data that goes into our records

11     management system on searches and strip

12     searches and contraband and those type of

13     things, we usually have enough codes in those

14     to be able to query the information if we -- if

15     there is -- for using the example that you just

16     provided, if we wanted to know how many times

17     contraband has been detected and what

18     classification of inmates might be having that,

19     those are -- we could go through that

20     information and find that.  I'm not aware of

21     that happening, but I know that it could be

22     done based on the data that we put into the

23     system.

24  Q  Okay.  Turning for a moment, in your time -- so

25     from being the OIC forward, other than

1       Mr. Payne, have there been other overdose

2       deaths of inmates at the Dane County Jail?

3  A   I don't know the answer to that.  Did you say

4       prior to?  I'm sorry.  Prior to or since or

5       both?

6  Q   Well, both.  I'm just trying to -- I said other

7       than Mr. Payne.  If you wanted to focus on

8       prior to his death, that's fine.

9  A   I don't know.  I know we've had other

10      in-custody deaths, and I don't know if any of

11      those were a result of an overdose.

12  Q   Well, let me change it slightly.  Do you have

13      any statistics or is it easily queryable in

14      terms of the number of, not deaths, but inmates

15      who consumed drugs and overdosed?

16          MR. REGINATO:  Object to foundation.

17  BY MR. CADE:

18  Q   Let me finish.  Such that they are

19      hospitalized, so they didn't die.  They were

20      either resuscitated, Narcan, whatever, but they

21      have definitively consumed drugs and required

22      medical attention.  Any sort of statistics like

23      that?

24          MR. REGINATO:  Same objection.

25          THE WITNESS:  I believe we can get

1      those statistics.  I don't know what those are.

2   BY MR. CADE:

3   Q   And I apologize, Captain, because my notes --

4      my handwriting is bad, but I don't think I

5      wrote it down, so if someone is coming into the

6      jail on a probation hold for a violation, is

7      that person strip searched, or is that

8      discretion of the booking deputy?

9   A   Generally, that person is not strip searched

10      unless the information from the arresting

11      officer or the deputy himself can articulate

12      why they believe that he may be concealing

13      contraband.  That would then go to the sergeant

14      for approval.  The sergeant would then either

15      approve or deny that request for a strip

16      search.

17   Q   Okay.  So if someone was arrested for drug

18      possession or being high on narcotics, are they

19      more likely or less likely to be strip searched

20      for contraband than someone, you know, brought

21      in because they stole a car?  Do you see the

22      distinction?

23   A   I do.

24              MR. REGINATO:  Object to foundation,

25      calls for speculation.

1   BY MR. CADE:

2   Q    In terms of an articulated reason to do a strip

3        search -- well, let me back up.  The deputies

4        who do booking are given training, I'm

5        assuming, about, A, how to articulate the

6        reasons to do a strip search; and, B, in terms

7        of what they are looking for, things of that

8        nature; is that a fair question?

9   A    That's fair.

10  Q    Okay.  So in terms of articulating a reason to

11       do a strip search, would you believe, now that

12       you are over the jail and beforehand the OIC,

13       that someone who has drug possession or drug

14       consumption is more likely to be carrying

15       contraband than someone who is arrested, say,

16       for stealing a car?

17  A    As it relates to contraband being drugs, yes.

18  Q    And is the fact that someone was arrested for

19       consuming or possessing drugs, is that enough

20       to be an articulable reason to do a strip

21       search to that individual prior to them coming

22       into the jail?

23            MR. REGINATO:  Object to foundation.

24            THE WITNESS:  In and of itself,

25       probably not.  I think our supervisors would

1      probably want to see a little bit more than

2      that, just other than the fact that they were

3      arrested for a drug charge.

4    BY MR. CADE:

5    Q    So when you say more than that, they would, I'm

6         assuming, look at things like, if the pupils

7         are dilated, if the person is agitated, if they

8         are shaking or if somehow indicating, you know,

9         like a sweat or whatever, that they were high

10        or coming off that high, is that an articulable

11        -- or additional articulable reason?

12   A    It is additional, and some may also depend on

13        the facts of the arrest itself.  If there was,

14        for example, drugs recovered from the person

15        during that arrest, probably less likely that

16        we would approve if the arresting officer said,

17        "I have paraphernalia.  I have large amounts of

18        cash."  I have -- "I observed what appeared was

19        a drug transaction, but I didn't recover any

20        drugs."  That might be a little bit more

21        articulable of a reason why we might conduct a

22        strip search.  Does that make sense?

23   Q    It does.  So if drugs are recovered, you are

24        saying that's less of a reason to do a strip

25        search because you've recovered drugs?

1   A    Possibly.  And why I'm saying that is maybe we

2        would have expected to find drugs in the

3        pockets or during our pat-down search, and we

4        didn't, so that might be something, but, you

5        know, there is a whole -- it's cumulative for

6        the circumstances.  So the supervisor would

7        look at that and say, yes, that's reasonable

8        that we would conduct a strip search, or, no,

9        I'm not comfortable based on what you've

10       provided me that I'll authorize it.

11  Q    Okay.

12  A    There is no hard and fast rules, if that helps.

13  Q    Now, after someone comes into the jail, so now

14       they have been issued their clothes, and they

15       have been booked.  Where do they go then?  Is

16       there a specific holding area?

17  A    There is.  They go to -- there is a couple

18       different places they may go.  Typically, for

19       the most part, people will go to our male dorm,

20       which is just a temporary housing location,

21       until our hearing and classification staff

22       determines the best housing location for them

23       on a more long-term basis.  If there is

24       significant behavioral issues or if there is

25       medical -- either high intoxication level or

1    other medical issues that we feel they need to

2    see before the nurse our jail medical staff

3    clears them for general population, they may

4    actually go to a segregation area where they

5    are in the cell by themselves.

6  Q   Okay.

7  A   But barring those type of circumstances, they

8    will go to a male holding area.  We call it our

9    male dorm.

10 Q   And that male dorm, the holding area, how long

11   are they generally held there prior to there

12   classification being determined?

13 A   Generally, if we feel that they are going to be

14   staying with us, they will move out of their

15   quicker.  If we think that the next day they

16   will probably have an initial appearance in

17   court, they may still be there until after

18   their initial appearance where they may get a

19   signature bond or bailed out of jail or those

20   types of things, or if they are waiting for

21   bail, we wouldn't move them out of that area;

22   so 24 to 48 hours, sometimes less.

23          On a case like a probation hold is

24   our -- and we feel like, oh, they are probably

25   going to stay here a few days until their agent

1          comes and cease them, we may -- particularly if

2          we have a history with that particular inmate;

3          they have been in our facility before; they

4          classify for this type of housing location,

5          they might go a little bit quicker.  But it is

6          short term.  To be simple, it's short term.

7          They wouldn't be staying there for weeks.  24,

8          48 hours.

9     Q    And how many pods are there at the jail; do you

10         know?

11    A    I do.  So in our -- just the public safety

12         building on the third and fourth floor, there

13         are four pods on each floor, so a total of

14         eight pods.

15    Q    Okay.  Any others?

16    A    No.  We have a city/county building jail that's

17         an older linear-style jail that has more of the

18         older type of linear-style jail.

19    Q    Cell blocks?

20    A    Cell blocks, yes, cell blocks.

21    Q    And how many are -- how many inmates are

22         roughly in each pod?

23    A    Full capacity for the -- we have two different

24         styles.  The large pods, we call them our 50

25         beds; and the other style is a split pod, so

1      they are just split in half, and there is 28 on

2      one side and 24 on the other, so 52 in the

3      split pods and 50 in the large pods.

4   Q  How many large pods are there?

5   A  Four.

6   Q  So, in essence, their jail is holding roughly

7      400, 410 capacity?

8   A  In the public safety building for the pods,

9      yes.  Our capacity is approximately 1,100 for

10     all of our facilities.

11  Q  And are the pods -- do they have different

12     categorizations, you know, like, how do you

13     explain this?  I did a deposition of a -- for a

14     prison the other day, and in that deposition,

15     you know, they had different wings, and one

16     wing would be people who were, you know,

17     troublemakers, or one area where people who

18     tended to be either in need of protection, you

19     know, gay, transsexual, whatever, or older

20     inmates.  Are the pods set up similarly in

21     terms of where they are assigned?

22  A  Yes.  So the people that would classify for our

23     pods are minimum or medium security inmates.

24  Q  No maximum?

25  A  No maximum unless we have administrative

1        override that allows them to go in there.

2   Q    And the maximum would go to the regular jail?

3   A    Yeah, the cell blocks.  The maximum would

4        typically be in the cell blocks.

5   Q    Is there any kind of searches or anything done

6        between going from the holding, the temporary

7        housing, to a pod?

8   A    I don't think so, no, not routinely.

9   Q    When an inmate comes into the jail, not a

10       Huber, but a new inmate or someone who is on a

11       probation hold, whatever, are they given

12       medical -- a medical screening?

13  A    Yes.

14  Q    And what typically occurs at the medical

15       screening?

16  A    Our medical staff has a questionnaire that goes

17       through a large variety of questions, ask about

18       their medical history, any medications they

19       might be taking.  They asked about street drug

20       use, those type of things, that might present a

21       medical problem while they are in our custody.

22  Q    And if they had been in your custody

23       previously, prior to coming, you know, so

24       someone say on a hold, would you go back over

25       their -- would you go back over their history

1      and say, you know, three years ago, five years

2      ago, this person was -- you know, we know they

3      were in for narcotics or they had street drug

4      use, would you do anything like that, look at

5      the -- or whether they look at the prior

6      history?

7                 MR. REGINATO:  I'm going to object to

8      foundation, just on the basis of I'm not sure

9      if we are talking about the medical staff or

10     during -- because we are talking about the

11     medical process now at this point, so I don't

12     know if you are talking about the medical

13     staff, Nate, or the actual jailers.

14  BY MR. CADE:

15  Q   I'm just trying to figure out -- I'll rephrase.

16                If someone is coming back into the

17     jail, so I'll use probation hold since I've

18     used that earlier, and there is a prior medical

19     questionnaire or history taken, does the jail

20     staff or the medical staff, do they look at

21     that prior history to say, hey, previously they

22     said they were allergic to, you know,

23     penicillin, and now they deny, or vice versa or

24     anything like that just to compare the prior

25     medical questionnaire to the current one?

1   A    The medical staff definitely would have charts

2        from prior stays.  I don't know if they compare

3        or not, but we do do a new questionnaire each

4        and every time somebody comes in the facility,

5        but they certainly would have access to prior

6        medical charts if they were here before, and I

7        don't know if they have a compare -- if they

8        compare those right on the spot or not, but

9        they -- but we do do the new questionnaire each

10       and every time.

11  Q    Do you know if, when someone comes into the

12       jail, are they tested or screened for narcotic

13       use?  Do you do a drug test, blood test, saliva

14       test, anything like that?

15  A    Not on a new arrest.

16  Q    What about a probation hold?

17  A    No, but we do do them for -- like we will do

18       random urinalysis testing for our sentenced

19       inmates, more specifically for our Hubers that

20       are going in and out.  We will get a baseline

21       to get an indicator of no drugs in the system

22       before we allow them out for the first time,

23       whether that be for work or volunteer, and then

24       we know if we do a random test, if we come back

25       with a positive urine test, we have already got

1          a baseline that has indicated no drugs in the

2          system, so we would have a violation on a

3          random UA further down the road, but not on new

4          arrests.

5     Q    Right, but so why would it not be done -- if

6          you've got a probation hold that the allegation

7          is drug use, is there a reason why you wouldn't

8          screen or the medical staff wouldn't screen for

9          that?

10    A    I think the probation agent would provide --

11         come in and get that.

12    Q    Okay.  But the probation agent is not coming in

13         within minutes of the person being brought in,

14         fair?

15    A    Fair.

16    Q    I mean, it could be 12 hours; it could be 48

17         hours before the agent gets around to popping

18         over to the jail, right?

19    A    Correct.

20    Q    And by that time, drug usage would dissipate or

21         show up as zero, right?

22              MR. REGINATO:  Object, speculation

23         and lack of foundation.

24              MR. CADE:  You can answer.

25              THE WITNESS:  Presumably.

1   BY MR. CADE:

2   Q   Okay.  So do you know why the test is not done,

3        at least collected?

4   A   I don't.

5   Q   Well, you are now the jail administrator, so

6        that would presumably be in your bailiwick to

7        make that determination, right?

8                  MR. REGINATO:  I'm going to object,

9        mischaracterizes the evidence.  Calls for

10       speculation, lacks foundation.  Go ahead.

11  BY MR. CADE:

12  Q   Let me rephrase.  As the jail administrator for

13       the -- specifically for the captain of security

14       services, is it fair to say that for the

15       jail -- let me back up.  Your supervisor is the

16       sheriff of Dane County, correct?

17  A   Correct.

18  Q   Okay.  There is no one else that's above you in

19       terms of supervision, fair?

20  A   Fair.

21  Q   Okay.  So if there is a policy for the jail,

22       other than the sheriff signing off on it, the

23       determination as to whether a policy needs to

24       either be implemented, revised, or rescinded

25       would go through you, correct?

1          MR. REGINATO:  I'm going to object to
2     lack of foundation.
3          THE WITNESS:  Yes.  I sign off on --
4     I'm the final approver or denier of policies
5     and updated policies.
6  BY MR. CADE:
7  Q   Okay.  So is there a rationale as the jail
8     administrator as to why, when people are
9     brought into the jail, that they are not given
10    a tox screen or some other test to determine if
11    they have drugs or other narcotics, et cetera,
12    in their system?
13         MR. REGINATO:  Object to foundation.
14         THE WITNESS:  I believe probably the
15    rationale behind that is to respect the privacy
16    of people, particularly those that are
17    unsentenced.
18 BY MR. CADE:
19 Q   Okay.  But someone who is on a probation hold
20    has been sentenced, correct?
21 A   They have been sentenced to the department of
22    correction.  We do not treat straight holds --
23    we treat those as unsentenced detainees.
24 Q   Is there a policy or some sort of guiding
25    principle as to why you would treat that type

1          of individual as an unsentenced detainee?

2                    MR. REGINATO:  Object, foundation.

3                    THE WITNESS:  There is, and I'm not

4          well versed on what that is, but I believe it's

5          founded in case law.

6    BY MR. CADE:

7    Q    Okay.  Is the booking area -- is there video

8          equipment or taping in the booking area?

9    A    There is.

10   Q    And are those videos maintained?

11   A    Yes.

12   Q    Can we turn for a moment -- Captain, would you

13         agree with me that contraband in the jail

14         environment generally is a bad thing?

15   A    Yes.

16   Q    And, obviously, weapons as contraband is bad

17         because, not only could an inmate get injured,

18         fights, stabbing, whatever, but one of the

19         deputies or staff could get injured as well,

20         fair?

21   A    Yes.

22   Q    Would you agree that drugs in the jail

23         environment are bad as well?

24   A    Yes.

25   Q    And I'm presuming -- I'm sure it has happened,

1      but I'm presuming that it's not as if the

2      deputies or staff are getting high from drugs

3      in that environment, fair?

4   A   Fair.

5   Q   Okay.  So why is it bad in the jail context for

6      there to be drug contraband?

7   A   Well, we -- our primary responsibility in the

8      jail and for our staff is for the well-being of

9      the inmates that are remanded to our custody,

10      and we certainly do not want any harm or

11      anything, overdoses or behavioral issues as a

12      result of drugs in the facility; so there is

13      any number of reasons why we wouldn't want

14      drugs in our facility, the least of which being

15      that they are also illegal to be in our

16      facility; so --

17   Q   Sure.  Well, and so -- and that's kind of my --

18      where I'm going back is, I know -- I apologize

19      if it seems as if I'm being redundant, but

20      if -- you would agree that the jail has a

21      responsibility to the inmates to protect them

22      to the best of the abilities of the sheriff's

23      department, true?

24   A   True.

25              MR. REGINATO:  Object to foundation.

1   BY MR. CADE:

2   Q    I'm sorry.  I didn't hear the answer.

3   A    True.

4   Q    And so that's everything from making sure they

5        get their medication -- you know, so if someone

6        is a diabetic, the jail is responsible to make

7        sure they are getting their shots or insulin in

8        whatever fashion or form, right?

9   A    Yes.

10  Q    And if drugs are coming into the jail, that

11       could result in harm or, in this case, death to

12       a prisoner, true?

13  A    If they get in the facility, true, yes.

14  Q    Okay.  I mean, I was reading some materials.  I

15       don't have it up in front of me, but I was

16       reading some materials that I think even having

17       Tylenol could be considered contraband unless

18       it was specifically approved, right?

19  A    Yes.  If it wasn't provided to them, yes, it's

20       contraband.

21  Q    Right, and, I mean -- and I'm assuming they

22       have some sort of canteen or commissary where

23       they can purchase Tylenol if they have a

24       headache or if they ask -- one way or the other

25       they can get Tylenol directly from the jail,

1              either by purchasing it or being supplied by

2              someone on staff, but bringing in Tylenol or

3              possessing it without specific authority or

4              purchase, that's contraband, right?

5     A     Yes.

6     Q     So the same holds true for drugs if -- if the

7              jail is trying to protect inmates from drug

8              usage and consumption in the jail, can you

9              explain to me the rationale why, prior to the

10            scanners, at a minimum, there wasn't even a

11            basic strip search done of every new arrestee?

12   A     Yes.  So our policy is really a balancing act,

13            and we are trying to, with respect to the

14            policy and with the rights and the privacy and

15            the dignity of the person being searched,

16            balancing that with the safety and security of

17            the jail.  You are completely correct that we

18            want to and need to and have a responsibility

19            to minimize as much as possible contraband

20            coming into the jail, but we also have to

21            balance that with the rights and the privacy

22            and the dignity of the person that we are going

23            to be searching.

24   Q     Well, if drugs get into the jail, especially

25            whether it's opioids or, you know, fentanyl,

1      things of that nature, there is a very strong

2      likelihood of serious harm or death to an

3      inmate, correct?

4                  MR. REGINATO:  Object to foundation,

5      calls for speculation.

6                  THE WITNESS:  Those -- the opiates

7      you mentioned certainly can be deadly, yes.

8   BY MR. CADE:

9   Q   And in order to do a strip search, as you said,

10      it's basically five minutes to do that search,

11      correct?

12  A   Correct.  It's not -- definitely not a time

13      issue.

14  Q   Okay.  When strip searches are done, is it just

15      one deputy or booking officer who is doing it,

16      or are there two, one to be a witness,

17      observer-type person?

18  A   Typically, it would just be one.  It would be

19      in an area that obviously doesn't have video

20      reproduction capabilities and not in view from

21      others, so it would be in a private area, and

22      most times, unless there is some type of

23      behavioral -- some type of behavioral concern,

24      it would just be one deputy.  If there was a

25      safety issue for some reason, there might be a

1      second.

2   Q   Sure, okay.  That's fair.

3   A   There might be a second if there is safety

4       concerns.  You know, unusually aggressive

5       behavior on the part of the subject, we might

6       have a second deputy there, but it would

7       also -- both would be same-sex searches.

8   Q   I'm going to show you in one second -- I'm

9       going to do what we call a share screen,

10      Captain.

11  A   Okay.

12  Q   One downside of Zoom depositions, it's not as

13      smooth as you would like.  I'm going to show

14      you -- can you see the screen that I have in

15      front of you?

16  A   Yes.

17  Q   Okay.  So this was presented to me as, I guess,

18      by the sheriff's office as a manual dealing

19      with the Dane County Jail.  Do you see that it

20      appears to be a date of January 21, 2016?

21  A   Yes.

22  Q   And if you need anything blown up, just let me

23      know.  So this is -- I have marked it

24      Exhibit 1.  I even put a nice little sticker on

25      there.  Below the Exhibit 1 sticker, you'll see

1          some -- it's in red, and the first page of the

2          document says County Doc, D-O-C, 158; do you

3          see that?

4    A     Yes.

5    Q     And if I go to the next page, it's now County

6          Doc 159?

7    A     Yes.

8    Q     So that is what we call a Bates, B-A-T-E-S,

9          number.  And all that is is it's a simple,

10          like, a control device so, you know, if I'm

11          telling you to look at a specific page and it's

12          unclear and we want to make sure we all have

13          the same version, folks tend to put the lawyers

14          or their staff put these on the documents when

15          they are produced so we can track and make sure

16          that we are using the exact same document every

17          time; does that make sense?

18    A     It does.

19    Q     So what I would like to do is jump to 170.  So

20          this is entitled -- or this section -- I'm

21          looking at Section 6, "Searches during

22          admissions," and it says, "All persons admitted

23          to the Dane County Jail will be searched during

24          the admissions process.  Searches of prisoners

25          during admissions are conducted to detect

1      weapons, drugs, or other contraband and ensure

2      a safe jail environment for prisoners and

3      staff.  B, the booking deputy will conduct a

4      full search of each person admitted to the jail

5      in the booking area of the public safety

6      building jail.  If required, the booking deputy

7      or designated deputy will conduct a strip

8      search of newly admitted persons in accordance

9      with the policy on searches of prisoners.  The

10     deputy conducting the search will document the

11     results in accordance with the policy on

12     searches of prisoners"; do you see that?

13  A   I do, yes.

14  Q   And is the policy on searches of prisoners, is

15     that within this manual, or is that a second or

16     different manual?

17  A   It's within that manual.

18  Q   Okay.  I just want to make sure, so where it

19     says Section 6B, if required will conduct a

20     strip search.  What would be the requirement to

21     conduct a strip search?

22  A   I don't know why the term "required" is there

23     being that the strip search, even of sentenced

24     inmates, is something we do frequently.  But I

25     don't think I would characterize that as

1         required.

2    Q    Okay.

3    A    It may be required if a supervisor directs you

4         to do the strip search, but I don't know why

5         the term required is in that portion of the

6         policy manual.

7    Q    Well, and that's why I wanted to follow up on

8         this because you told me earlier that whatever

9         deputy -- and just so we are clear, the people

10        who are in the booking area are deputies,

11        correct, it's not -- you don't have a non-Dane

12        County Jail staff working the booking area; you

13        don't have an outside civilian, for example?

14   A    Nope.  Those are deputies that work in the

15        booking area.

16   Q    So you had mentioned earlier that the deputy

17        has discretion in terms of doing a strip

18        search?

19   A    Yes.

20   Q    So that's why I'm wondering why the language

21        "if required" and what would constitute a

22        requirement?

23   A    I can't think of a required time with the

24        exception of if a supervisor directs that

25        deputy to conduct a strip search, then it may

1      be required, but I can't think of a time in and

2      of itself the strip search would be required of

3      them.

4  Q   And if a supervisor tells a deputy, "Do a strip

5      search," it's not as if the deputy can say,

6      "I'm not doing the strip search"; that's a

7      command direction they have to respond to and

8      follow?

9  A   That is correct, unless it's illegal.

10 Q   So I've turned now to 183, which is entitled,

11     "Full Search of Individuals."  And it says

12     specifically that a full search is not a strip

13     search, correct?

14 A   A full search is not a strip search, correct.

15 Q   One of the policies -- it says, "Inmates will

16     be searched under the following circumstances,"

17     and one of the them is returning from the

18     attorney's booth.  Can you explain to me the

19     rationale as to why, after returning from

20     meeting -- the only time you are in the

21     attorney's booth is to meet with an attorney,

22     correct?

23 A   Yes.

24 Q   And you are not doing visitation in the

25     attorney's booth, right?

1  A    Correct.

2  Q    So is there a rationale as to why a strip

3       search occurs after -- or not a strip search, a

4       full search, a search, occurs after the inmate

5       has met with their attorney?

6  A    Yes.  So in the attorney booth, at least -- and

7       I can't speak for other facilities, but in our

8       attorney booth, there is a pass-through for

9       exchanging documents, and if anything was to be

10      passed through that pass-through from an

11      attorney to the detainee, then -- we wouldn't

12      examine any documents, but during that search,

13      we would search for contraband.

14 Q    So when you were the OIC, was there a greater

15      concern with someone coming into the jail after

16      being arrested bringing in contraband or a

17      greater concern that an attorney would turn

18      around and provide contraband?

19 A    I would -- from my perspective, the greater

20      risk for introduction of contraband is from the

21      inmate coming in the facility.

22 Q    Okay.  You would agree with me that if

23      contraband is found after meeting with an

24      attorney, an investigation is done, right?

25 A    It would be, yes.

1    Q    Are you aware of contraband having been found

2         after an inmate met with an attorney during

3         your time period either as OIC or as jail

4         administrator?

5    A    Not that I'm aware of, no.

6    Q    Because if an attorney supplies contraband to

7         an inmate, they could be charged criminally,

8         true?

9              MR. REGINATO:  Objection, lacks

10        foundation.

11             THE WITNESS:  I would -- knowingly,

12        yes, there would be a potential for a charge,

13        yes.

14   BY MR. CADE:

15   Q    And then if I turn to 185, this is a policy on

16        strip search, correct?

17   A    It is -- your policy seems to be different than

18        what I have in front of me as they existed in

19        2016.  I believe there is probably something

20        much more updated than 1992.

21   Q    Okay.  I didn't mix and match, so this was --

22        the Bates number on there was what was given to

23        me; so --

24   A    Yeah, I have -- so I'm looking at our policy

25        manual from the time of 2016, and I believe I

1      have a searches of inmates policy, which is

2      603.04, and then it includes strip searches as

3      a section of that policy.  I don't know that

4      there is differences in the verbiage in it or

5      not.

6    Q  Okay.  So 603.04?

7    A  Yes.

8    Q  Okay.  I don't have .04.

9    A  And it's -- that policy was instituted on 1/21

10     of 2016.

11   Q  Okay.  So that would seem to be, if I go back

12     to the beginning, 1/21 of '16 when this was all

13     done, correct?

14   A  Correct.  That's your table of contents, but I

15     don't know that it's consistent in -- so if you

16     look down on -- under "security operations" in

17     Section 603.

18   Q  Uh-huh.

19   A  Section 603.04 is searches of inmates.

20   Q  Right.

21   A  That contains the information on strip searches

22     within that policy.  Prior to that, there may

23     have been a separate policy for strip searches.

24     I'm not familiar with that policy.

25   Q  And that's where -- that was going to be my

1      next question because if I go back to the

2      beginning of Exhibit 1, and, again, we see here

3      that January 21st of '16, correct?

4   A   Yes.

5   Q   So when I go back the table of contents, the

6      first document I have is 601.01, and it says

7      that that's 5/22/08; is that the same for

8      yours?

9   A   Yes.

10  Q   So if I scroll, I go from 601.01 to 603.05.

11     Now -- and that's 9/1 of '98.  If I go back to

12     the first page, there is no 603.5.  It's

13     603.05; do you see that?

14  A   Yes.

15  Q   Now, I presume that part of this is I didn't

16     get -- your manual, how thick is it?  How many

17     pages is your manual?

18  A   It's probably four inches thick.  It doesn't

19     have a numbering system from one through the

20     end because there is separate page numbers for

21     each policy itself.

22  Q   Sure.

23  A   But it's thick.

24  Q   What I presume is that I was given, most

25     likely, a redacted or -- not a redacted -- a

1   reduced version that only provided certain

2   pages, which is fine, but clearly if I go from

3   601.01 to 603.05, I'm clearly missing the prior

4   page about searches of inmates, correct?

5              MR. REGINATO:  I'm going to object to

6   mischaracterizes what's -- what we produced

7   during our response in discovery.  Nate, if you

8   recall, we provided you certain policies.  We

9   then discussed our response to your document

10  request, and we came to an agreement that we

11  would just provide you with the entire policy

12  manual.  We followed up by providing you with

13  the entire policy manual shortly thereafter,

14  which can be found in Bates-labeled County DOC

15  365 all the way to County DOC -- it starts on

16  365, ends on 721, so you are still looking at

17  the initial document production prior to us

18  conferring and agreeing to just provide you

19  with the whole manual.

20             MR. CADE:  Matteo, can you -- I don't

21  have that, and there could be lots of reasons

22  why I don't have it.  Again, I'm not

23  insinuating anything.  Is that something you

24  can send to me right now?

25             MR. REGINATO:  Yeah, sure.  I think

1      it should be uploaded.  Let me see if I sent

2      you a link because it's a long -- we produced

3      an additional 860 documents after we spoke, but

4      let me see if I have the e-mail.  One second.

5                  (Discussion off the record.)

6                  (Recess taken.)

7  BY MR. CADE:

8  Q    I'm going to show you -- I was showing you

9      previously Exhibit 1.  I'm going to switch

10     over, and for this portion I'm going to show

11     you Exhibit 8.  Can you see that, sir?

12 A    Yes.

13 Q    Okay.  So these are documents that counsel has

14     provided previously starting with Bates stamp

15     DOC 436, and this is 1/21 of '16, searches of

16     inmates, correct?

17 A    Yes.

18 Q    And here they talk about an updated jail

19     curriculum as of June of 2015, and now we have

20     got different definitions or terms:  First

21     pat-down search, full or custodial search,

22     strip search, body cavity search, exigent

23     circumstances, and physically disabled person,

24     correct?

25 A    Correct.

1  Q   So in looking at Exhibit 8, it goes through the

2      procedures for each one, and if I go to

3      Section 3, "strip search and body cavity

4      searches," and that's on Bates County DOC 438,

5      "No person may be the subject of a strip search

6      unless she is a detained inmate ascribed in

7      Section 4 below."  When I go to section 4

8      below, it identifies a list of -- a list of

9      criteria for someone to be considered a -- for

10     someone to be considered for strip search,

11     correct?

12 A   Yes.

13 Q   Okay.  So I want to go over this.  One second.

14     So there is a list of things in Section 4B.

15     For the purpose of this section -- or, I'm

16     sorry.  "You can only do a strip search when

17     you have written permission from the supervisor

18     and when the person is a detainee"; correct?

19 A   Yes.

20 Q   And we have got five categories for the

21     purposes -- under Section B, "For the purpose

22     of this section, an inmate is considered a

23     detainee under any of the following

24     circumstances."  And I want to go to Section 5.

25     Your policy -- and I believe -- correct me if

1      I'm wrong, Captain, if you know -- it appears

2      that in accordance with Section 968.255; do you

3      see that?

4   A  Yeah.

5   Q  And Section 5, so 4B5, "The detainee was

6      arrested or otherwise lawfully detained or

7      taken into custody resulting in incarceration

8      in the Dane County Jail for not less than 12

9      hours with one or more other inmates."  So I

10     read that -- and correct me if I'm wrong -- if

11     that person is going to be held as a detainee

12     in the jail for more than 12 hours and around

13     other prisoners, they could be strip searched,

14     correct?

15  A  Yes, they could be strip searched, yes.

16  Q  Okay.  Because I will -- your language is

17     slightly different than the statute, so I'm

18     going to throw the statute up there, and that's

19     it right here.  The statute just says -- it

20     says nothing about 12 hours; it just says,

21     "detained or taken into custody if they are

22     incarcerated, imprisoned or otherwise detained

23     in a jail or prison with one or more other

24     persons"; do you see that?

25  A  Yes.

1   Q   Okay.  And so there is no doubt that when

2       someone comes in after being arrested, we have

3       different categories of that person.  I

4       jokingly said when I asked at the beginning

5       about people being arrested, I would assume you

6       get a lot during the Badger game; people get

7       drunk and they do stupid things?

8   A   Yes.

9   Q   Okay.  And usually if someone is held for

10      public intoxication, doing something stupid

11      while drunken, the idea is not to hold them for

12      more than 12 hours, fair?

13  A   Yeah, fair.  That would be our hope.

14  Q   Yeah.  So your policy is different than the

15      statute because you are saying, hey, we are

16      going to hold them -- if we hold them more than

17      12 hours, we have the ability to call them a

18      "detainee," air quotes, and do a strip search,

19      correct?

20  A   We are permitted to do that, yes.

21  Q   So showing you again Exhibit 8, and, I

22      apologize, I was looking -- I did not see -- if

23      there is a specific page; if you tell me to

24      turn to it, I will, but I don't see anything

25      here, Captain, that talks about discretion.  We

1    had talked about earlier the booking person has

2    discretion about doing a search.  It clearly

3    indicates on page 437, the second page of the

4    policy, "full custodial searches shall be

5    conducted on all new arrests"?

6  A  Yes.

7  Q  I don't see anything here about strip searches

8     and the criteria for doing a strip search.

9  A  Yeah.  Other than it indicates that may be

10    performed with written permission from a

11    supervisor and when inmate is a detainee.

12  Q  Right, so if they are a detainee -- if I came

13    in on a probation hold, there is a very strong

14    likelihood I'm going to be there for more than

15    12 hours, right?

16  A  Uh-huh.

17  Q  Is that a "yes"?

18  A  Yes, yes.

19  Q  You are doing great, so don't worry.  That was

20    your first one.

21           So where is it in the policy that

22    tells the booking deputy, here's how you make

23    the determination as to whether you should or

24    should not do a strip search, putting aside the

25    legal side of it, you know, we can only do it

1  in these instances?  Where do you get it for --

2  you know, how does your booking deputy know,

3  hey, this person looks shady.  I think there

4  might be something.  Is there a training

5  manual?  Are they told?  Are they, you know,

6  given examples?

7           MR. REGINATO:  I'm just going to

8  object on the basis that the question has been

9  asked and answered, and he testified earlier

10  about the discretionary powers that the

11  deputies have based on what they observe and

12  they know.

13           THE WITNESS:  In the very first part

14  of that policy, 603.04, searches of inmates,

15  under the second paragraph, it's not specific

16  about, you know, circumstances of the arrest,

17  but it does give a general indication that

18  "deputies must balance the legitimate interest

19  of safety, security, and management against the

20  intrusiveness of the intended search to ensure

21  that the search is reasonable and therefore

22  constitutional.  Deputies must also ensure that

23  for more intrusive searches there is adequate

24  justification to support the degree of

25  intrusion to be employed."

1   BY MR. CADE:

2   Q   Can you show me where you are reading from?

3   A   Yeah.  I was reading from under the -- in

4       603.04, the subject line is "searches of

5       inmates," and under the policy, there is two

6       short paragraphs under policy before it gets

7       into the definitions.

8   Q   Okay.

9   A   And you are right in that it does not give

10      specific circumstances indicating that if there

11      was drugs not found on the -- on the arrest

12      circumstances; it doesn't get specific into

13      that, but it's a little bit more general in

14      talking about balancing that safety and

15      security with the intrusiveness of the search

16      to be performed.  But we do have -- one of the

17      things that the department of corrections

18      requires of us is that we have annual training

19      with the topic of searches, and those vary from

20      year to year to satisfy our requirements from

21      DOC to train on searches annually, so sometimes

22      it's about those type of specific things;

23      sometimes it's about specifically how you might

24      do that search procedurally, or other times it

25      might be talking about when is a good time to

1      use your discretion and under what

2      circumstances, so there is -- we do train

3      annually on a variety of different topics

4      related to searches, and I don't know

5      specifically -- I'm not able to tell you

6      specifically when we may have trained on

7      circumstances of when is a good time to do a

8      strip search because the topic is broadly

9      "searches with inmates."

10  Q  Now, in that paragraph you read, the second

11     paragraph under the policy, "the deputy must

12     balance the legitimate interest of safety,

13     security, and management."  What does it mean

14     by management?

15  A  In that context, I believe management is

16     referring to the management of inmates and the

17     ability of our deputies to manage a housing

18     unit and the management of inmates.

19  Q  So would that be fair to say that if someone is

20     coming into the facility that if you've got one

21     person just coming in and no other inmates are

22     waiting, that's a different management issue as

23     compared to if you've got ten people in the

24     booking area you've got to get through there?

25  A  That may apply to management as well.

1    Q    I would imagine that if you've got ten people

2         in the booking area, the goal is to get them

3         booked as fast as possible so they are not all

4         sitting around, fair?

5                   MR. REGINATO:  Object to foundation.

6                   THE WITNESS:  That is the goal, but

7         as administration, we would certainly not

8         support the concept of time management over

9         safety and security.

10   BY MR. CADE:

11   Q    Sure.  I understand that aspect, but if there

12        is ten people waiting in the booking area, the

13        booking deputies need to get those people

14        processed as soon as possible and get them out

15        of the booking area, correct?

16                  MR. REGINATO:  Object to foundation,

17        calls for speculation and is providing an

18        incomplete hypothetical.

19                  THE WITNESS:  Correct, but not at the

20        expense of safety and security.

21   BY MR. CADE:

22   Q    First shift, second shift, are those the

23        typical shifts, or what are the time periods?

24   A    Our first shift is 7:00 a.m. to 3:00 p.m.,

25        second shift is 3:00 p.m. to 11:00 p.m., and

1    third shift is 11:00 p.m. to 7:00 a.m.

2  Q  Okay.  I want to switch over to -- show you

3    Exhibit 2, and I apologize, I'll blow this up.

4    This was provided to me -- how do I tell who

5    the booking person is on a given day?  Is there

6    something that says booking?

7  A  Do you mean from -- are you looking at like a

8    roster or a daily schedule or something?

9  Q  Yeah, correct.

10  A  Yes, the booking deputy is indicated as booking

11    deputy or D3.

12  Q  Okay.  So would that be under field services,

13    security services?

14  A  It would be under security services.

15  Q  Okay.

16  A  And I'm not seeing what you are seeing so, but

17    I believe --

18  Q  I'm sorry.  I thought I had shared the screen.

19    My apologies.

20  A  No problem.  So under security services.

21  Q  Hold on.  Let me switch this.  There we go.

22    Let's try that again.  Do you need me to blow

23    it up any more?

24  A  If you can get it just slightly bigger.  Okay.

25    Now if you scroll down just a little bit.

1     Central booking, you would see Shaun

2     Christians (phonetic).  He would have been the

3     booking deputy that day.

4  Q  Is there only one booking deputy?

5  A  No.  Also -- there is only one booking deputy,

6     and actually our booking deputy is a promoted

7     position, so typically deputies that are

8     working in the jail are deputies ones or twos,

9     and a deputy three has been promoted to a

10    booking deputy.  In addition to the booking

11    deputy, where you see that MT1 down there,

12    that's our movement team one.  Those are also

13    working in the booking area with -- but the

14    booking deputy is actually a lead worker,

15    doesn't have full supervisory responsibilities

16    over those deputies, but he's in charge of the

17    area and is a lead worker in that area.

18 Q  Okay. So if I wanted to find out who worked on

19    a particular day, I would need this roster,

20    correct?

21 A  Yes.

22 Q  Okay.

23            MR. CADE:  Matteo, can I get the

24    roster that was provided -- let me scroll down.

25    It starts on December 22nd, and then it goes

1    December 23rd, and then it skips to December

2    29th.

3            MR. REGINATO:  Yeah, I see that.

4            MR. CADE:  30th, and then 31st.  I

5    don't have for the 26th of December.  That's

6    the date I'm looking for.

7            MR. REGINATO:  Okay.

8            MR. CADE:  And I just went through

9    quickly what you had -- that Dropbox, and they

10    are not in there.

11            MR. REGINATO:  Yeah, I don't know why

12    it wouldn't --

13            MR. CADE:  So you can see it skips,

14    so the 24th through the 28th were never

15    provided.

16    BY MR. CADE:

17    Q    Okay, Captain, I'm going to switch --

18            MR. CADE:  Can I switch, Matteo?  Are

19    you good?

20            MR. REGINATO:  Yeah, I'm good.  I'm

21    trying to see what that's --

22    BY MR. CADE:

23    Q    I'm going to show you Exhibit 3, Captain, and

24    this is for a particular inmate by the name of

25    Paul Tarkenton.

1    A    Okay.

2    Q    And it's a three-page document.  Does this tell

3         me who the booking person is?

4    A    It does not.  It tells us the booking clerk, so

5         the civilian clerk that did the data entry on

6         it.

7    Q    Okay.

8    A    But it does not tell us the booking deputy.

9         Give me just a second to go through it to make

10        sure I'm saying that correctly.

11   Q    We will go to the first page, and when you tell

12        me to move, I'll move.

13   A    Okay.  Okay, next page.  You know what, I think

14        towards the bottom of that where it says

15        "officer," and it says, "Luke Deibele," that

16        very well may be the booking deputy that was in

17        charge during that particular booking.

18   Q    Okay.

19   A    I'm not sure, but I believe that to be true.

20   Q    Deibele spelled D-E-I-B-E-L-E.

21   A    And that's pronounced Deibele.

22   Q    Okay.  And if I go to the next page, nothing

23        really there, correct?

24   A    Correct.

25   Q    And so the only officer that is identified is

1      Officer Deibele, correct?

2  A   Correct.

3  Q   So it doesn't -- so is Officer Deibele, would

4      he be a booking officer, or would he be that

5      CMT3 or whatever, the control management team?

6  A   Nope.  He would be -- he would be the booking

7      deputy, I believe --

8  Q   Okay.

9  A   -- that took that person into custody from the

10     arresting agency.

11 Q   And that would be the individual who makes the

12     determination as to whether or not a strip

13     search is at least sought or asked for,

14     correct?

15 A   Correct.

16 Q   Now, there is also here some alert codes; do

17     you see that?

18 A   I do.

19 Q   And it says "drug abuse history"?

20 A   Yes.

21 Q   Does drug abuse history indicate grounds for a

22     strip search under that discretionary model

23     that you indicated?

24          MR. REGINATO:  I'm going to object,

25     incomplete hypothetical.  Calls for

1      speculation.

2                  THE WITNESS:  It may not necessarily

3      trigger that in and of itself.

4   BY MR. CADE:

5   Q   Would they do a -- I'm sorry, is the booking

6      officer trained to, for example, look at --

7      when a person comes in, check their pupils, see

8      if they are dilated, see if there is any issues

9      with them medically or at least physical

10     appearance that would suggest they are either

11     high or on some other drugs?

12  A   Yes, training and experience.

13  Q   Okay.  Exhibit 4, this one is not Bates

14     numbered, previously provided.  I just wanted

15     to be clear, so this is part of the

16     investigation into the death -- I can blow this

17     up a little bit -- into the death of Mr. Payne.

18     And it indicates -- we are still dealing with

19     Paul Tarkenton -- and it says, "The strip

20     search that was conducted revealed that he had

21     contraband, tested positive for heroin"; do you

22     see that?

23  A   Yes.

24  Q   Okay.  And he was searched at 12/27, 2:45 p.m.,

25     which was the day after he came in, and I'll go

1    back to 3, just so you have that.  3 he was

2    brought in at -- at least his property was

3    inventoried at 5:02 p.m., correct?

4              MR. REGINATO:  I'm just going to

5         object on the basis of foundation.  Are you

6         asking the witness whether the report states

7         what you are saying or whether this actually

8         occurred?

9              MR. CADE:  No.  I'm saying I

10        presume -- I asked him the property was

11        inventoried, because it says taken at 5:02 p.m.

12        on 12/26, so he's just verifying that their

13        records are correct and accurate, and that

14        would be roughly the time they would have taken

15        Mr. Tarkenton's property on December 26th.

16             MR. REGINATO:  Okay, well, lacks

17        foundation.

18   BY MR. CADE:

19   Q    Captain, are the records of the jail, would you

20        presume them to be true and accurate?

21   A    I would.

22   Q    Okay.  So if it says "property taken at 17:02,"

23        or 5:02 p.m. on December 26th; do you expect

24        that to be accurate?

25   A    Yes.

1    Q    Okay.  And if it says the property's taken at

2         12:02 -- I'm sorry, at 5:02, that presumes that

3         Mr. Tarkenton had been brought in sometime

4         prior to that, correct?

5    A    I would think so, and I don't know how that

6         time and date stamp auto-populates, whether

7         that's the -- when we change them over or

8         whether that's when our civilians log those

9         items into the property bag, so I don't know --

10        I apologize, but I don't know exactly when

11        that -- it does appear that it's an

12        auto-populated time stamp being that there are

13        seconds on it, so I don't know exactly when

14        that gets auto-generated.

15   Q    Right.  I'm just saying it's fair to say that

16        at 5:02 p.m., the minute that -- you know, it's

17        not as much if Tarkenton showed up at 5:02 and

18        the inventory takes place.  Other things would

19        have occurred prior to the inventory being

20        reported?

21   A    Yes.

22   Q    So the presumption is if the inventory was

23        reported at 5:02, he would have been booked and

24        brought into the jail at some point prior to

25        5:02, fair?

1    A    I believe that would probably be accurate, yes.

2    Q    Okay.  And so if I go to earlier, this appears

3         to be some -- there is some prior bookings; do

4         you see that?  There is property taken on July

5         7th of '17?

6    A    Yes.

7    Q    And then there is also July 20th of '17

8         property taken in, correct?

9    A    Correct.

10   Q    Okay.  We know that this booking number --

11        nope, I don't see it, so there is no booking

12        number here.  I'm sorry, here's Booking

13        No. 506433; do you see that?

14   A    Yes.

15   Q    So 506433, the same thing, it gives the -- he

16        was sentenced in June of '17, Judge Kawski,

17        K-A-W-S-K-I, gave him a sentence on June 28th,

18        and then it indicates 506433 that he's on

19        probation hold and in state out-of-county hold,

20        correct?

21   A    Yes.

22   Q    And then according to -- well, I'm sorry.

23        There is an arrest number, and it appears that

24        he's arrested at 3:00 on December 27th,

25        correct?

1    A    Yes.

2    Q    And that's for controlled substances?

3    A    That looks accurate, yes.

4    Q    So that it may not be Deputy Deibele who was

5         the booking deputy on the 26th, Deibele may be

6         the booking deputy on the 27th when he's

7         arrested for the possession of the narcotics,

8         fair?

9              MR. REGINATO:  Objection, lacks

10        foundation.

11             THE WITNESS:  I believe you are

12        reading that correctly, yes.

13   BY MR. CADE:

14   Q    Okay.  So going back to Exhibit 4, they finally

15        do a strip search the next day of Tarkenton,

16        and they find heroin.  And this report,

17        Exhibit 4, is prepared by Luke Deibele,

18        correct?

19   A    Yes.

20   Q    And you would expect Deputy Deibele to be

21        truthful and accurate in terms what he writes

22        down, correct?

23   A    I would expect, yes.

24   Q    Exhibit 5, this is a report prepared by Deputy

25        Matthew Earll, E-A-R-L-L; do you see that?

1    A    Yes.

2    Q    And Deputy Earll -- hold on one second.  Deputy

3         Earll says that he did a -- talks about his

4         shift -- if you need me to blow it up, let me

5         know -- but then when we go down to incident

6         information at 2:10 p.m. on December 27th, he

7         was working public safety building, went down

8         to Pod C, and then on Pod C he saw an inmate --

9         hold on one second.  I'm sorry, down here,

10        movement of inmate, he and Deputy Vick

11        (phonetic) went to Bunk 13, which is Tarkenton,

12        and they observed him making jerking movements

13        with his arm and head; do you see that?

14   A    I do.

15   Q    And he said, "This was not normal behavior.

16        Once he was standing up, I escorted him, and

17        then I asked him what he was on," and he said

18        he took heroin earlier in the day, and then he

19        said, "I took it before I came in yesterday";

20        do you see that?

21   A    Yes.

22   Q    And then he says he did a pat-down, and he did

23        not locate anything.

24   A    Yes.

25   Q    So at approximately 2:10 -- let me make sure

1     that I got the time right -- yeah, at 2:10 on

2     December 27th, they have already located pain;

3     do you see that?

4  A  What was the -- the last one was 2:10, right?

5  Q  Right.  2:10 he arrives on scene.  They have

6     already located Payne who has collapsed; do you

7     see that?

8  A  Yes.

9  Q  And they do a pat-down search, officer --

10    Deputy Earll, and he doesn't locate any drugs,

11    right?

12               MR. REGINATO:  I'm just going to

13    object to lack of foundation.  He wasn't

14    involved in the investigation, and he didn't

15    write this report, so the only information that

16    he could have is the ability to read that

17    report and tell you what it says, so just a

18    standing objection on the basis that he lacks

19    foundation to testify about the events.

20               MR. CADE:  Sure.  But he was also put

21    forward as someone who is knowledgeable; so --

22               MR. REGINATO:  Well, hold on a

23    second.  I'm going to object to that.  You

24    asked for someone who is knowledgeable about

25    the policies and practices of the Dane County

1      Jail, not somebody who was knowledgeable about

2      the investigation or about the events; let's

3      clarify.

4   BY MR. CADE:

5   Q   Again, Captain, you would expect these reports

6      to be truthful and accurate, correct?

7   A   That would be my expectation, yes.

8   Q   And if you are presented with a report, you

9      would not turn around and believe that whoever

10      drafted the report would have lied or

11      misrepresented the facts as they observed,

12      fair?

13   A   That is fair.

14   Q   So according to Deputy Earll, he arrived at

15      2:10, Shannon Payne is already down, he does a

16      pat-down of Tarkenton, and he finds no drugs,

17      fair?

18   A   Fair.

19   Q   Then if I go to 6, strip search -- hold on.

20      This is by Deputy Reiser, R-E-I-S-E-R, dated

21      12/27 of '16?

22   A   Okay.

23   Q   And it says he's doing a strip search at 2:50

24      p.m.  Is there a reason, Captain, that if one

25      deputy has done a pat-down and they have

1    located no narcotics, is there a reason why

2    another deputy would then do a strip search

3    five minutes later -- or, I'm sorry, 40 minutes

4    later?

5                MR. REGINATO:  Object to foundation,

6    calls for speculation.  You can answer, if you

7    know.

8                THE WITNESS:  The reason they would

9    be doing a strip search, and not to speak

10   directly about the 40 minutes later, but the

11   reason they would be doing a strip search is

12   it's a much more thorough search than the

13   pat-down.

14   BY MR. CADE:

15   Q   Okay.  But if the pat-down is what folks are

16       generally getting when they come into the jail

17       and a pat-down is done of Tarkenton and no

18       drugs are found, what would be the rationale

19       for doing a strip search of Tarkenton after the

20       pat-down?

21                MR. REGINATO:  Same objection.  Asked

22   and answered.

23                THE WITNESS:  You know, I scanned

24   through some of these reports, but I believe

25   that there was indicators in Deputy Earll's

1        report that said he saw behavior consistent

2        with being what his professional experience

3        might be with witnessing somebody who was on

4        drugs or high, and the fact that he -- did he

5        tell him that he had taken heroin?  Is that

6        the --

7   BY MR. CADE:

8   Q    He said he had taken it earlier, like -- that's

9        what I'm trying to figure out.  Deputy Earll,

10        he's told, "Hey, I did drugs," and then he did

11        a pat-down, and he didn't find anything.  Is

12        there a reason why Deputy Earll didn't use his

13        discretion and automatically go into strip

14        search mode?

15                MR. REGINATO:  I'm going to object to

16        speculation.  I'm going to object to lack of

17        foundation.  If you know Deputy Earll and why

18        he made certain decisions, you can answer;

19        otherwise, go ahead.

20                THE WITNESS:  I believe he was

21        probably taken to an area that was not in view

22        of others.  I would think that it was then a

23        supervisor said, hey, did we get a strip

24        search?  I don't know this.  I am actually

25        completely speculating, but there would not

1      have been an immediate strip search in that pod

2      in front of other inmates.  They would have to

3      be transported to another more private area.

4      I'm not suggesting that would take 40 minutes

5      to do, but he was probably observed, moved down

6      to an area that was more private, and then

7      was -- somebody was directed to do a strip

8      search based on the behavior that Deputy Earll

9      observed.

10  BY MR. CADE:

11   Q    Okay.  And if a strip search takes place -- so

12      I want you to -- you know, according to this,

13      at 2:50 p.m. someone else was called out, and a

14      strip search was done, not Tarkenton, and it

15      says no contraband found, and then on page 2 of

16      Exhibit 6, there is a strip search of someone

17      else at 3:05 p.m., no contraband found.  And I

18      thought it was on this one, and I apologize,

19      but it -- in this, someone is interviewed,

20      Crawford, and it says that he was talking to

21      Hasad (Phonetic) at the time -- he indicates

22      that he had just arrived in the pod, and he was

23      suffering from withdrawals; do you see that?

24   A    Yes.

25   Q    And then I'm going to turn to 7.  Exhibit 7 is

1      another report by Detective Wiest, W-I-E-S-T?

2   A   You are correct, yes.

3   Q   And according to this, in the interview,

4      Tarkenton had just gotten into 4C, a skinny

5      white guy, and that when Wiest interviewed this

6      other prisoner he told the medical staff, this

7      being Tarkenton, that he does not go through

8      withdrawals.  He stated -- Tarkenton stated

9      that he was arrested because he was nodding off

10     inside his vehicle and put on a probation hold,

11     and he says, "I still got a little bit."

12     Question, "Heroin?"  And he said, "Yeah, that

13     he got into the jail," and, in fact, it says --

14     give me one second.  I didn't highlight this.

15     I apologize.  Oh, here we go.  "The white guy,"

16     meaning Tarkenton, "stated that he did some

17     heroin downstairs."  Would the booking area be

18     downstairs from Pod 4C?

19  A   Yes, but I believe he's -- while he was in

20     holding.  Is that what it says?  So he probably

21     would have been -- he's probably referring to

22     male dorm, which, yes, is downstairs, but so is

23     booking.

24  Q   So if he is doing heroin while he is either in

25     booking or in -- can you hold one second?  I'm

1      sorry.

2                 (Recess taken.)

3   BY MR. CADE:

4   Q    So getting back to my question, if he indicates

5        that he's doing drugs either in booking or down

6        in holding, down in the male dorm, would you

7        agree that's a failure of the system to find

8        the contraband?

9                 MR. REGINATO:  Object to foundation.

10       I'm also going to object to the form of the

11       question.  It calls for speculation.  I'm also

12       going to object that it calls for a legal

13       conclusion.  Go ahead.

14                 THE WITNESS:  Yeah, we -- can you

15       repeat the question one more time?

16   BY MR. CADE:

17   Q    Yeah.  I'm just -- you know, we had talked

18       earlier about, you know, you had agreed that

19       one of the things that the jail is tasked with

20       is essentially keeping inmates safe, and I said

21       obviously, you know, we are not talking weapons

22       that could injure staff, and it's unlikely that

23       the staff is getting the drugs directly from

24       the inmates -- there is other ways to get the

25       drugs -- and if the jail is supposed to keep

1          inmates safe and you've got an inmate who is

2          doing the drugs either directly in booking or

3          in housing, is that not a failure of the jail

4          to keep the drugs out?

5                    MR. REGINATO:  Same objection.

6                    THE WITNESS:  In this particular

7          case, we certainly would have liked to prevent

8          them from coming in.  I don't know that it's

9          realistic to stop 100 percent of all contraband

10         from coming into the jail.  That's our goal,

11         but did this -- it appears obvious that

12         contraband did enter the facility, and it was

13         in dorm, and we wouldn't want that there.

14    BY MR. CADE:

15    Q    And is it correct -- now that the body scanners

16         are present, are you, as the supervisor, the

17         jail supervisor, are you catching more

18         contraband before it gets in?

19                    MR. REGINATO:  Objection, calls for

20         speculation.

21    BY MR. CADE:

22    Q    Are you noticing a drop in contraband?

23    A    I don't know.  I don't have the -- any specific

24         numbers, and sometimes those go up and down

25         based on the amount of opioid use in the

1      community, and it's probably a reflection in

2      the jail.  If I were to speculate, I would say

3      that probably the use of the body scanner -- I

4      know that it's been effective in detecting

5      contraband.  I don't know if there is a

6      reduction in contraband as a result of the body

7      scanner or not.

8   Q  I'm sorry.  You lost me there.

9   A  I know we have recovered contraband and

10     detected contraband with the use of the body

11     scanner, but I don't know about, as far as the

12     numbers go, whether there has been a reduction

13     post body scanner compared to pre body scanner.

14  Q  And if I were to make a request, Captain,

15     for -- I would imagine that the jail keeps

16     records in terms of deaths and drug overdoses

17     over a given period of time, correct?

18  A  Yes, that's correct.

19  Q  So what would I need to ask for if I wanted to

20     find out about either drugs or deaths or

21     overdoses at the jail?  What would I need to

22     ask for specifically?

23  A  I think that would probably cover that.

24     Specifically you would ask for the number of --

25     it would probably start by asking for instances

1      of overdoses within the Dane County Jail.

2      Probably a second request for incidents of

3      overdoses resulting in death in the Dane County

4      Jail.  We would provide you -- and case numbers

5      associated with.  Once you got those case

6      numbers, you could get those actual reports as

7      well.

8   Q   And would they be able to -- would those

9      reports identify the basis of the drugs getting

10      in?  The reason I say that is I dealt with

11      people who have had drugs in their system

12      before they got in, so they weren't consuming

13      in the jail; they were consuming out of the

14      jail.  They come in, and they die or succumb to

15      an OD or through withdrawal, but would the

16      investigation identify the source of the

17      narcotics?

18              MR. REGINATO:  Object to speculation,

19      foundation.

20              THE WITNESS:  The reports would

21      probably indicate if we knew.

22   BY MR. CADE:

23   Q   Okay.  And you said there were two scanners?

24   A   Yes, two scanners.

25   Q   Okay.  And one is just for Huber?

1    A    Yes.  It's on the third floor where people

2         would be coming back in from going outside,

3         yes, so people coming in and out having Huber

4         or other work-release privileges.

5                   MR. CADE:  Okay.  Perfect.  Those are

6         my questions.

7              (Proceedings concluded at 12:04 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF WISCONSIN  )
                       )  SS:
2   COUNTY OF MILWAUKEE )

3

4

5            I, ALICE M. BARBELN, a Registered

6   Professional Reporter and Notary Public in and for

7   the State of Wisconsin, do hereby certify that the

8   above deposition of KERRY PORTER was recorded by me

9   on June 16, 2021, and reduced to writing under my

10  personal direction.

11           I further certify that I am not a

12  relative or employee or attorney or counsel of any

13  of the parties, or a relative or employee of such

14  attorney or counsel, or financially interested

15  directly or indirectly in this action.

16           In witness whereof I have hereunder set

17  my hand and affixed my seal of office at Milwaukee,

18  Wisconsin, this 21st day of June, 2021.

19

20

21

22                        _____
                              Notary Public
23                        In and for the State of Wisconsin

24
    My Commission Expires:  October 26, 2021.
25

**Exhibits**

**Porter Kerry 061 621 Ex.1** 3:6 56:24,25 64:2 66:9

**Porter Kerry 061 621 Ex.2** 3:6 75:3

**Porter Kerry 061 621 Ex.3** 3:7 77:23

**Porter Kerry 061 621 Ex.4** 3:8 80:13 84:14,17

**Porter Kerry 061 621 Ex.5** 3:9 84:24

**Porter Kerry 061 621 Ex.6** 3:10 90:16

**Porter Kerry 061 621 Ex.7** 3:10 90:25

**Porter Kerry 061 621 Ex.8** 3:11 66:11 67:1 69:21

**0**

**04** 63:8

**1**

**1** 4:5 30:18 56:24, 25 64:2 66:9

**1,100** 44:9

**1,500** 6:18

**1/21** 63:9,12 66:15

**100** 33:25 34:4 93:9

**11:00** 74:25 75:1

**12** 48:16 68:8,12, 20 69:12,17 70:15

**12/26** 81:12

**12/27** 80:24 87:21

**12:02** 82:2

**12:04** 96:7

**13** 85:11

**158** 57:2

**159** 57:6

**16** 63:12 64:3 66:15 87:21

**17** 83:5,7,16

**170** 57:19

**17:02** 81:22

**183** 60:10

**185** 62:15

**1992** 62:20

**2**

**2** 75:3 90:15

**20** 30:18

**2010** 17:2

**2015** 17:3 66:19

**2016** 11:10 13:4 14:7,17 17:6 20:22 56:20 62:19,25 63:10

**2017** 17:7

**2018** 14:23 15:8 16:2 23:10 25:19 26:21

**2020** 4:25 8:5

**20th** 83:7

**21** 56:20

**21st** 64:3

**22nd** 76:25

**23rd** 77:1

**24** 4:19,21 8:7 42:22 43:7 44:2

**24th** 77:14

**26th** 77:5 81:15,23 84:5

**27** 8:22 11:10

**27th** 83:24 84:6 85:6 86:2

**28** 44:1

**28th** 77:14 83:17

**29th** 77:2

**2:10** 85:6,25 86:1, 4,5 87:15

**2:45** 80:24

**2:50** 87:23 90:13

**3**

**3** 67:3 77:23 81:1

**30** 25:2

**30th** 77:4

**31st** 77:4

**365** 65:15,16

**3:00** 74:24,25 83:24

**3:05** 90:17

**4**

**4** 67:7 80:13 84:14, 17

**40** 88:3,10 90:4

**400** 44:7

**410** 44:7

**436** 66:15

**437** 70:3

**438** 67:4

**48** 42:22 43:8 48:16

**4B** 67:14

**4B5** 68:5

**4C** 91:4,18

**5**

**5** 30:18 67:24 68:5 84:24

**5/22/08** 64:7

**50** 25:3,5 43:24 44:3

**506433** 83:13,15, 18

**52** 44:2

**5:02** 81:3,11,23 82:2,16,17,23,25

**6**

**6** 57:21 87:19 90:16

**601.01** 64:6,10 65:3

**603** 63:17

**603.04** 63:2,6,19 71:14 72:4

**603.05** 64:10,13 65:3

**603.5** 64:12

**6B** 58:19

**7**

**7** 90:25

**721** 65:16

**7:00** 74:24 75:1

**7th** 83:5

**8**

**8** 4:5 66:11 67:1 69:21

**860** 66:3

**9**

**9/1** 64:11

**968.255** 68:2

**98** 64:11

**A**

**a.m.** 74:24 75:1

**AA** 19:22

**abilities** 52:22

**ability** 69:17 73:17 86:16

**absent** 26:23

**abuse** 79:19,21

**Academy** 11:1

**access** 19:2,4 47:5

**accordance** 58:8, 11 68:2

**accurate** 81:13, 20,24 83:1 84:3,21 87:6

**act** 54:12

**actual** 24:12 46:13 95:6

**addition** 76:10

**additional** 14:1 18:1,16 40:11,12 66:3

**adequate** 71:23

**administration** 11:24 16:9 29:6 74:7

**administrative** 44:25

**administrator** 4:16 49:5,12 50:8 62:4

**admissions** 57:22,24,25

**admitted** 57:22 58:4,8

**adversary** 5:19

**advised** 11:13

**after-action** 28:22

**afternoon** 4:9

**agency** 9:19 12:13 13:5 14:11 79:10

**agent** 12:4 42:25 48:10,12,17

**aggressive** 56:4

**agitated** 40:7

**agree** 26:20 32:4 51:13,22 52:20 61:22 92:7

**agreed** 92:18

**agreeing** 65:18

**agreement** 65:10

**ahead** 49:10 89:19 92:13

**air** 69:18

**airport** 24:16

**alert** 27:22 79:16

**Alice** 5:10 6:10

**allegation** 48:6

**allergic** 46:22

**allowed** 13:8

**amount** 93:25

**amounts** 40:17

**analysis** 36:1

**annual** 72:18

**annually** 72:21 73:3

**answering** 6:4

**anyplace** 15:4

**apologies** 75:19

**apologize** 32:3 38:3 52:18 69:22 75:3 82:10 90:18 91:15

**appearance** 42:16,18 80:10

**appeared** 40:18

**appears** 56:20 68:1 83:2,23 93:11

**apply** 73:25

**approval** 38:14

**approve** 22:21,23 38:15 40:16

**approved** 53:18

**approver** 50:4

**approximately** 9:4,16 44:9 85:25

**area** 10:21,22 12:19,23 13:2,3, 11,24 14:12,15 15:1,5 27:11 34:15 41:16 42:4,8,10,21 44:17 51:7,8 55:19,21 58:5 59:10,12,15 73:24 74:2,12,15 76:13, 17 89:21 90:3,6 91:17

**areas** 16:2

**arm** 85:13

**arrest** 12:12 19:3 21:8 40:13,15

47:15 71:16 72:11 83:23

**arrested** 11:24 20:5 21:14 32:15 38:17 39:15,18 40:3 61:16 68:6 69:2,5 83:24 84:7 91:9

**arrestee** 12:18 13:10 20:18 23:23 33:15 54:11

**arresting** 13:5 14:11 22:14 38:10 40:16 79:10

**arrests** 18:12 48:4 70:5

**arrived** 87:14 90:22

**arrives** 86:5

**articulable** 22:11 39:20 40:10,11,21

**articulate** 22:17, 18 25:16 38:11 39:5

**articulated** 22:9 39:2

**articulating** 39:10

**ascribed** 67:6

**aspect** 74:11

**assigned** 9:23 44:21

**assignment** 8:7, 8,9 9:13

**assume** 7:24 12:12 20:2,4 69:5

**assuming** 10:6 27:21 39:5 40:6 53:21

**assumption** 18:22

**attempting** 26:19

**attention** 37:22

**attorney** 60:21 61:5,6,8,11,17,24 62:2,6

**attorney's** 60:18, 21,25

**authority** 54:3

**authorization** 19:5

**authorize** 41:10

**auto-generated** 82:14

**auto-populated** 82:12

**auto-populates** 82:6

**automatically** 89:13

**average** 24:19 25:3 28:19

**aware** 27:7 29:3 34:23 35:16 36:3, 20 62:1,5

---

**B**

**B-A-T-E-S** 57:8

**bachelor's** 10:15, 23

**back** 8:3 12:18 20:3 21:21 31:23 32:22 33:4,24 34:3,9 39:3 45:24, 25 46:16 47:24 49:15 52:18 63:11 64:1,5,11 81:1 84:14 92:4 96:2

**background** 19:4, 11

**bad** 32:3 33:7 38:4 51:14,16,23 52:5

**Badger** 24:25 69:6

**bag** 82:9

**bail** 42:21

**bailed** 42:19

**bailiwick** 49:6

**balance** 54:21 71:18 73:12

**balancing** 54:12, 16 72:14

**barring** 42:7

**base** 26:16

**based** 33:19 36:5, 22 41:9 71:11 90:8 93:25

**baseline** 11:16 47:20 48:1

**basic** 19:4 54:11

**basically** 55:10

**basis** 24:23 29:17 30:22 31:24 32:24 34:5 35:13 41:23 46:8 71:8 81:5 86:18 95:9

**Bates** 57:8 62:22 66:14 67:4 80:13

**Bates-labeled** 65:14

**bathroom** 7:15

**beds** 43:25

**beginning** 12:11 63:12 64:2 69:4

**behavior** 56:5 85:15 89:1 90:8

**behavioral** 41:24 52:11 55:23

**bent** 27:15

**bet** 9:8

**betterment** 19:24

**bigger** 75:24

**bit** 19:19 40:1,20 43:5 72:13 75:25 80:17 91:11

**blocks** 43:19,20 45:3,4

**blood** 47:13

**blow** 75:3,22 80:16 85:4

**blown** 56:22

**body** 14:18,21,24 15:6,21 23:15,19, 21 24:5,6,13 66:22 67:3 93:15 94:3,6, 10,13

**bond** 42:19

**booked** 17:19 41:15 74:3 82:23

**booking** 13:12,18, 25 14:1 15:1 16:10 24:22 29:24 33:5,9 34:15 38:8 39:4 51:7,8 55:15 58:3, 5,6 59:10,12,15

**bookings** 83:3

**booth** 60:18,21,25 61:6,8

**born** 10:20

**bottom** 78:14

**brand-new** 20:4

**brassiere** 21:7

**break** 7:14,17,19, 20 14:5 18:17

**breaks** 7:16

**briefing** 28:14

**briefing-type** 28:8

**bring** 12:5 32:14

**bringing** 25:13,20 54:2 61:16

**brings** 12:2 14:11 20:7

**broadly** 73:8

**brought** 12:14,17 14:9 21:16 22:3 23:1 24:21 38:20 48:13 50:9 81:2 82:3,24

**building** 43:12,16 44:8 58:6 85:7

**Bunk** 85:11

**bureau** 8:10,15, 18,22 9:3

**busy** 25:4 33:6

---

**C**

**CADE** 4:8 12:9,25 15:13,25 20:19 24:17 26:1 27:6 30:25 32:20 37:17 38:2 39:1 40:4 46:14 48:24 49:1, 11 50:6,18 51:6 53:1 55:8 62:14

70:1,22 71:2 73:24 74:2,12,13,15 75:5,6,10 76:1,3,4, 5,6,10,13,14 78:3, 4,8,16,17 79:4,6 80:5 83:10,11,12 84:5,6 91:17,23,25 92:5 93:2

65:20 66:7 72:1
74:10,21 76:23
77:4,8,13,16,18,22
80:4 81:9,18 84:13
86:20 87:4 88:14
89:7 90:10 92:3,16
93:14,21 95:22
96:5

**call** 42:8 43:24
56:9 57:8 69:17

**called** 4:2 90:13

**calls** 26:25 30:23
32:16 38:25 49:9
55:5 74:17 79:25
88:6 92:11,12
93:19

**canteen** 53:22

**capabilities** 55:20

**capacities** 4:20

**capacity** 43:23
44:7,9

**captain** 4:9,13,15,
22 5:2 6:12 11:9,
23 16:11 38:3
49:13 51:12 56:10
68:1 69:25 77:17,
23 81:19 87:5,24
94:14

**captains** 9:22

**car** 38:21 39:16

**carrying** 39:14

**carts** 18:24

**case** 11:16,19
42:23 51:5 53:11
93:7 95:4,5

**cases** 20:17 21:9,
10

**cash** 40:18

**catching** 93:17

**categories** 67:20
69:3

**categorizations**
44:12

**caught** 32:9

**cavity** 66:22 67:3

**cease** 43:1

**cell** 42:5 43:19,20
45:3,4

**Central** 76:1

**cetera** 18:20 50:11

**change** 14:8,9
20:24 21:3 37:12
82:7

**changed** 13:21
14:17 23:20,25

**changeover**
20:23

**changing** 26:14

**characterize**
58:25

**charge** 8:9 9:18,
20,25 10:4 13:13
16:3,7 21:15 40:3
62:12 76:16 78:17

**charged** 62:7

**charts** 47:1,6

**check** 19:4 80:7

**checking** 13:4

**checkpoint** 24:15

**choose** 34:2,11

**chose** 29:19

**Christians** 76:2

**circumstances**
22:6 41:6 42:7
60:16 66:23 67:24
71:16 72:10,12
73:2,7

**City** 12:3

**city/county** 43:16

**civilian** 59:13 78:5

**civilians** 82:8

**clarify** 19:19 87:3

**classification**
36:18 41:21 42:12

**classify** 43:4
44:22

**clear** 6:18 59:9
80:15

**clears** 42:3

**clerk** 14:1 78:4,5

**close** 12:20

**clothes** 13:10
20:24 21:4 35:10

41:14

**clothing** 26:15,17

**CMT3** 79:5

**codes** 36:13 79:16

**collapsed** 86:6

**collected** 49:3

**comfortable** 41:9

**command** 60:7

**commissary**
53:22

**communicates**
22:15

**community** 94:1

**compare** 46:24
47:2,7,8

**compared** 14:17
73:23 94:13

**compiling** 29:17

**complaint** 35:13

**completed** 13:18
29:12 30:4 31:14

**completely** 5:25
54:17 89:25

**completes** 30:5

**conceal** 25:8

**concealing** 22:12,
16,19 33:20 38:12

**concept** 74:8

**concern** 16:15
55:23 61:15,17

**concerns** 56:4

**concluded** 96:7

**conclusion** 92:13

**conduct** 13:23
40:21 41:8 58:3,7,
19,21 59:25

**conducted** 27:9
31:11 57:25 70:5
80:20

**conducting** 58:10

**conducts** 14:14

**conferring** 65:18

**confined** 15:5

**confused** 7:5

**considered** 21:21
53:17 67:9,10,22

**consistent** 63:15
89:1

**constitute** 59:21

**constitutional**
71:22

**consult** 16:19

**consumed** 37:15,
21

**consuming** 39:19
95:12,13

**consumption**
39:14 54:8

**containers** 18:24

**contents** 63:14
64:5

**context** 52:5
73:15

**continue** 21:1,6

**contraband**
15:11,15,23,24
17:11,15 18:1
22:12,13,17,20
25:14 26:4,7,18,22
27:4,16 28:17
29:2,15 31:12,15
32:14,23 33:21
35:20 36:12,17
38:13,20 39:15,17
51:13,16 52:6
53:17,20 54:4,19
58:1 61:13,16,18,
20,23 62:1,6 80:21
90:15,17 92:8
93:9,12,18,22
94:5,6,9,10

**control** 57:10 79:5

**controlled** 84:2

**correct** 9:1 10:10
13:20 16:5,6 17:4,
14 18:16 20:9,10
23:12,13 26:12
29:23 30:15 31:3
35:1 48:19 49:16,
17,25 50:20 54:17
55:3,11,12 59:11
60:9,13,14,22 61:1
62:16 63:13,14
64:3 65:4 66:16,

24,25 67:11,18,25
68:10,14 69:19
74:15,19 75:9
76:20 78:23,24
79:1,2,14,15 81:3,
13 82:4 83:8,9,20,
25 84:18,22 87:6
91:2 93:15 94:17,
18

**correction** 50:22

**corrections** 17:20
18:18 72:17

**correctly** 78:10
84:12

**counsel** 66:13

**County** 4:14,17,18
8:6 12:15,24 21:23
37:2 49:16 56:19
57:2,5,23 59:12
65:14,15 67:4 68:8
86:25 95:1,3

**couple** 7:16 41:17

**court** 42:17

**cover** 94:23

**crappy** 9:8

**Crawford** 90:20

**create** 28:5

**created** 31:3

**criminally** 62:7

**criminology**
10:16

**criteria** 67:9 70:8

**cumulative** 41:5

**current** 46:25

**curriculum** 66:19

**custodial** 26:9,12
66:21 70:4

**custodian** 9:6
17:8

**custody** 12:14
45:21,22 52:9
68:7,21 79:9

**cut** 6:24 34:7

---

**D**

**D-E-I-B-E-L-E**

78:20

**D-O-C** 57:2

**D3** 75:11

**daily** 24:23 30:17, 21 32:24 75:8

**Dane** 4:14,17,18 8:6 12:14,23 21:23 37:2 49:16 56:19 57:23 68:8 86:25 95:1,3

**data** 36:10,22 78:5

**date** 56:20 77:6 82:6

**dated** 87:20

**day** 8:19 9:23 24:19,24 25:4 30:18,19 32:7 42:15 44:14 75:5 76:3,19 80:25 84:15 85:18

**days** 42:25

**deadly** 55:7

**deal** 5:22

**dealer** 19:12

**dealing** 11:4 17:16 33:5 35:22 56:18 80:18

**dealt** 95:10

**death** 11:9 37:8 53:11 55:2 80:16, 17 95:3

**deaths** 37:2,10,14 94:16,20

**December** 11:10 76:25 77:1,5 81:15,23 83:24 85:6 86:2

**decisions** 10:2 89:18

**define** 25:23,25

**definitions** 66:20 72:7

**definitively** 37:21

**degree** 10:15,23, 25 71:24

**Deibele** 78:15,20, 21 79:1,3 84:4,5, 17,20

**denier** 50:4

**deny** 22:23 38:15 46:23

**department** 11:7 50:21 52:23 72:17

**depend** 40:12

**dependent** 20:15

**depends** 25:25

**deposed** 5:2

**deposition** 7:23 11:13 44:13,14

**depositions** 5:6 56:12

**deputies** 17:20 18:18 22:15 39:3 51:19 52:2 59:10, 14 71:11,18,22 73:17 74:13 76:7, 8,16

**deputy** 12:1 13:12,18 34:10,17, 18 35:9 38:8,11 55:15,24 56:6 58:3,6,7,10 59:9, 16,25 60:4,5 70:22 71:2 73:11 75:10, 11 76:3,4,5,6,9,10, 11,14 78:8,16 79:7 84:4,5,6,20,24 85:2,10 86:10 87:14,20,25 88:2, 25 89:9,12,17 90:8

**designated** 58:7

**detail** 11:14

**details** 29:14

**detain** 13:16

**detained** 67:6 68:6,21,22

**detainee** 51:1 61:11 67:18,23 68:5,11 69:18 70:11,12

**detainees** 14:22 50:23

**detect** 13:7 15:11 27:4,16 57:25

**detected** 25:8 26:9 36:17 94:10

**detecting** 15:22

94:4

**detective** 8:10,15, 18,22 9:3 91:1

**detectives** 8:23

**determination** 49:7,23 70:23 79:12

**determine** 50:10

**determined** 42:12

**determines** 41:22

**device** 57:10

**diabetic** 53:6

**die** 37:19 95:14

**difference** 33:13

**differences** 63:4

**dignity** 24:11 54:15,22

**dilated** 40:7 80:8

**diligent** 18:3

**directed** 90:7

**direction** 60:7

**directly** 53:25 88:10 92:23 93:2

**directs** 59:3,24

**disabled** 66:23

**discombobulated** 5:14

**discover** 26:23

**discovered** 35:21

**discovery** 65:7

**discretion** 33:10, 17,18 34:1,8,10 38:8 59:17 69:25 70:2 73:1 89:13

**discretionary** 71:10 79:22

**discussed** 65:9

**discussion** 66:5

**dissipate** 48:20

**distinction** 31:25 38:22

**division** 8:15 9:7 10:4

**divisions** 10:1

**Doc** 57:2,6 65:14, 15 66:15 67:4 72:21

**document** 57:2, 16 58:10 64:6 65:9,17 78:2

**documents** 11:22 13:15 57:14 61:9, 12 66:3,13

**door** 12:22

**doors** 12:20

**dorm** 41:19 42:9, 10 91:22 92:6 93:13

**doubt** 69:1

**downside** 56:12

**downstairs** 91:17,18,22

**drafted** 87:10

**drop** 93:22

**Dropbox** 77:9

**drug** 19:12 38:17 39:13 40:3,19 45:19 46:3 47:13 48:7,20 52:6 54:7 79:19,21 94:16

**drugs** 8:24 17:16 25:9,14,20 27:9,23 28:16,21,25 33:21 35:22 37:15,21 39:17,19 40:14,20, 23,25 41:2 47:21 48:1 50:11 51:22 52:2,12,14 53:10 54:6,24 58:1 72:11 80:11 86:10 87:16 88:18 89:4,10 92:5,23,25 93:2,4 94:20 95:9,11

**drunk** 69:7

**drunken** 69:11

**due** 11:9

**duly** 4:3

**duties** 8:19

**E**

**E-A-R-L-L** 84:25

**divisions** 10:1

**e-mail** 66:4

**earlier** 24:18 46:18 59:8,16 70:1 71:9 83:2 85:18 89:8 92:18

**Earll** 84:25 85:2,3 86:10 87:14 89:9, 12,17 90:8

**Earll's** 88:25

**early** 17:7

**easier** 29:10

**easily** 34:24 37:13

**East** 10:22

**education** 10:14 11:2

**effective** 15:23 26:3,6 94:4

**electronic** 22:1

**employed** 71:25

**employees** 17:21 19:5

**end** 5:13 28:1 64:20

**ends** 65:16

**enjoyable** 9:12

**enjoyed** 35:9

**ensure** 58:1 71:20,22

**entail** 9:21

**enter** 13:9 18:2 93:12

**entering** 13:23 14:15 15:24

**entire** 65:11,13

**entities** 12:4

**entitled** 57:20 60:10

**entry** 78:5

**environment** 19:13 51:14,23 52:3 58:2

**equipment** 51:8

**escorted** 85:16

**essence** 44:6

essentially 32:5 92:20

events 86:19 87:2

evidence 49:9

exact 57:16

**EXAMINATION** 4:7

examine 61:12

examined 4:4

examples 71:6

exception 59:24

exceptions 21:10, 11

exchanges 18:10

exchanging 61:9

exhibit 4:5 56:24, 25 64:2 66:9,11 67:1 69:21 75:3 77:23 80:13 84:14, 17,24 90:16,25

exigent 66:22

existed 13:4 62:18

existence 14:18

exists 14:10

expect 81:23 84:20,23 87:5

expectation 87:7

expected 41:2

expense 74:20

experience 9:12, 14 80:12 89:2

explain 23:10 24:8 44:13 54:9 60:18

external 8:12,14, 16

extraneous 17:22

eye 27:13,14

**F**

facilities 44:10 61:7

facility 18:2,5,12, 14 21:9,12,16 22:14 26:5,8,19

27:4 31:24 34:9 43:3 47:4 52:12, 14,16 53:13 61:21 73:20 93:12

fact 39:18 40:2 89:4 91:13

facts 40:13 87:11

failure 92:7 93:3

fair 6:20,21 7:11, 12,21,22 8:1,2 17:24 18:22 19:16, 17 26:24 31:9 39:8,9 48:14,15 49:14,19,20 51:20 52:3,4 56:2 69:12, 13 73:19 74:4 82:15,25 84:8 87:12,13,17,18

falls 9:24

familiar 11:11,12 63:24

fashion 53:8

fast 41:12 74:3

FBI 10:25

feel 16:15 24:5 33:6 42:1,13,24

felt 15:21 16:19

female 21:6 23:14, 22

fentanyl 54:25

field 8:14 75:12

fight 6:12

fights 51:18

figure 7:10 16:25 34:6,20 46:15 89:9

filled 13:20

final 10:2 50:4

finally 7:23 84:14

find 24:14 28:19 29:15 32:23 36:20 41:2 76:18 84:16 89:11 92:7 94:20

finding 28:16 31:11

finds 87:16

fine 37:8 65:2

fingerprints 14:2

finish 5:8,15,24 37:18

five-and-a-half 28:15

fix 7:8

floor 12:19 14:4 43:12,13 96:1

focus 37:7

folks 24:20 28:24 57:13 88:15

follow 59:7 60:8

food 17:23 18:20, 23,24 19:12,14

form 12:8 15:19 24:3 25:21 53:8 92:10

formally 11:6

forward 36:25 86:21

found 27:10,23 28:21 29:15 61:23 62:1 65:14 72:11 88:18 90:15,17

foundation 12:8 15:9,18 20:13 24:2 32:17 37:16 38:24 39:23 46:8 48:23 49:10 50:2,13 51:2 52:25 55:4 62:10 74:5,16 81:5,17 84:10 86:13,19 88:5 89:17 92:9 95:19

founded 51:5

fourth 43:12

free 18:13

frequent 31:24 34:5

frequently 58:24

freshly 32:15

Friday 9:23

front 53:15 56:15 62:18 90:2

full 10:7 43:23 58:4 60:11,12,14 61:4 66:21 70:4 76:15

fingerprints 14:2

**G**

game 69:6

games 24:25

gave 7:24 83:17

gay 44:19

general 11:18 42:3 71:17 72:13

generally 19:13 38:9 42:11,13 51:14 88:16

give 5:9,25 6:23 71:17 72:9 78:9 91:14

goal 74:2,6 93:10

good 4:9 5:11 9:11,13 72:25 73:7 77:19,20

graduate 10:25

great 8:17 11:14 70:19

greater 61:14,17, 19

grounds 79:21

guards 17:19

guess 24:18 25:22,24 56:17

guiding 50:24

guy 91:5,15

**H**

half 44:1

hand 11:6 21:4

handing 26:14

handwriting 38:4

happen 28:18

happened 28:25 51:25

happening 36:21

hard 41:12

harm 52:10 53:11 55:2

harmful 13:8

Hasad 90:21

head 6:3,5,6,11, 13,14,19 17:5 85:13

headache 53:24

heads 7:9

hear 6:8 53:2

hearing 41:21

held 42:11 68:11 69:9

helps 41:12

heroin 80:21 84:16 85:18 89:5 91:12,17,24

hey 27:22 28:24 46:21 69:15 71:3 89:10,23

high 10:14,21 38:18 40:9,10 41:25 52:2 80:11 89:4

highest-ranking 16:12

highlight 91:14

history 5:1 16:2 19:3 43:2 45:18,25 46:6,19,21 79:19, 21

hold 11:25 12:5,6 13:14 22:25 23:1, 3,7,24 38:6 42:23 45:11,24 46:17 47:16 48:6 50:19 69:11,16 70:13 75:21 83:19 85:2,9 86:22 87:19 91:10, 25

holding 41:16 42:8,10 44:6 45:6 91:20 92:6

holds 6:2 50:22 54:6

holes 36:2

home 9:24

homicides 8:24

hope 69:13

hopeful 7:16

hospitalized

37:19

**hours** 7:17 9:24 42:22 43:8 48:16, 17 68:9,12,20 69:12,17 70:15

**housing** 14:3 41:20,22 43:4 45:7 73:17 93:3

**Huber** 15:2 17:19 18:14 24:20 31:18, 21 32:1,5,10,11, 14,23 35:24 45:10 95:25 96:3

**Hubers** 47:19

**hypothetical** 74:18 79:25

___

**I**

**idea** 69:11

**identified** 78:25

**identifies** 67:8

**identify** 95:9,16

**ignore** 24:20

**illegal** 52:15 60:9

**image** 24:7

**imagine** 74:1 94:15

**implemented** 49:24

**important** 5:7,15, 17,24

**imprisoned** 68:22

**in-custody** 37:10

**inside** 12:20 91:10

**incarcerated** 68:22

**incarceration** 68:7

**inches** 64:18

**incident** 85:5

**incidents** 17:11 95:2

**include** 31:13

**includes** 63:2

**incomplete** 74:18 79:25

**indicating** 40:8 72:10

**indication** 71:17

**indicator** 47:21

**indicators** 88:25

**individual** 35:24 39:21 51:1 79:11

**Individuals** 60:11

**information** 13:14,19 14:1 28:8,12 29:6,18 34:24 35:4,17 36:4,14,20 38:10 63:21 85:6 86:15

**initial** 42:16,18 65:17

**injure** 92:22

**injured** 51:17,19

**inmate** 17:18 19:24 20:4,23 21:12 22:5,8,24 23:8,9 33:5,16 34:2,3,9,12 43:2 45:9,10 51:17 55:3 61:4,21 62:2,7 67:6,22 70:11 77:24 85:8,10 93:1

**inmates** 15:2 18:12 25:13 31:19, 21 32:23 36:18 37:2,14 43:21 44:20,23 47:19 52:9,21 54:7 58:24 60:15 63:1,19 65:4 66:16 68:9 71:14 72:5 73:9,16,18,21 90:2 92:20,24 93:1

**inside** 12:20 91:10

**insinuating** 16:22 65:23

**installation** 27:18

**instances** 30:8 71:1 94:25

**instituted** 63:9

**insulin** 53:7

**intended** 71:20

**interest** 71:18 73:12

**interim** 5:21

**internal** 8:12

**internet** 7:9

**interview** 91:3

**interviewed** 90:19 91:5

**intoxication** 41:25 69:10

**introduction** 61:20

**intrusion** 71:25

**intrusive** 15:22 24:9,12 71:23

**intrusiveness** 71:20 72:15

**inventoried** 81:3, 11

**inventory** 82:18, 19,22

**investigation** 61:24 80:16 86:14 87:2 95:16

**investigations** 8:10,12

**involved** 86:14

**issue** 15:14 55:13, 25 73:22

**issued** 41:14

**issues** 20:3,8 23:15 25:12,19,23, 25 41:24 42:1 52:11 80:8

**items** 82:9

___

**J**

**jail** 4:15 11:23 12:1,5,6,15,24 13:9,22,23,24 14:4 15:5,12,24 16:9, 14,17 17:12 19:2,4 20:8,24 21:24 22:3 25:19 32:7 33:24 35:19,21 37:2 38:6 39:12,22 41:13 42:2,19 43:9,16, 17,18 44:6 45:2,9 46:17,19 47:12 48:18 49:5,12,15, 21 50:7,9 51:13,22 52:5,8,20 53:6,10,

25 54:7,8,17,20,24 56:19 57:23 58:2, 4,6 59:12 61:15 62:3 66:18 68:8, 12,23 76:8 81:19 82:24 87:1 88:16 91:13 92:19,25 93:3,10,17 94:2, 15,21 95:1,4,13,14

**jailers** 46:13

**January** 56:20 64:3

**jargon** 7:6

**jerking** 85:12

**job** 9:8

**jokingly** 69:4

**Jones** 34:18

**Judge** 83:16

**July** 83:4,7

**jump** 57:19

**jumping** 5:12

**June** 66:19 83:16, 17

**justification** 71:24

___

**K**

**K-A-W-S-K-I** 83:17

**K-E-R-R-Y** 4:11

**Kawski** 83:16

**keeping** 92:20

**Kerry** 4:2,11

**kind** 12:11 28:8 45:5 52:17

**knew** 95:21

**knowingly** 62:11

**knowledge** 30:10, 11 36:6

**knowledgeable** 86:21,24 87:1

___

**L**

**lack** 48:23 50:2 86:13 89:16

**lacks** 32:17 49:10 62:9 81:16 84:9 86:18

**language** 59:20 68:16

**large** 40:17 43:24 44:3,4 45:17

**largely** 20:15

**late** 17:6

**law** 51:5

**lawfully** 68:6

**lawyers** 57:13

**layer** 26:17

**lead** 76:14,17

**learning** 9:11,13

**leave** 9:24

**legal** 13:15 70:25 92:12

**legitimate** 71:18 73:12

**level** 12:20 41:25

**lied** 87:10

**lieutenant** 8:9,11, 17,18,20 9:2,9,19 16:20

**lieutenants** 9:22

**likelihood** 55:2 70:14

**linear-style** 43:17,18

**lingo** 7:6

**link** 66:2

**list** 67:8,14

**listening** 6:7

**locate** 85:23 86:10

**located** 16:14 86:2,6 88:1

**locating** 31:15

**location** 14:3,15 41:20,22 43:4

**log** 28:2,5,14 31:2, 9,13,17 82:8

**logs** 28:1

**long** 4:17,22 9:2,

15 10:11 33:1 42:10 66:2

**long-term** 41:23

**Longer** 10:12

**looked** 35:7,23

**lose** 32:10

**lost** 94:8

**lot** 69:6

**lots** 65:21

**love** 10:22

**Luke** 78:15 84:17

## M

**mad** 9:10

**made** 89:18

**Madison** 4:13 12:3

**mail** 18:4,10

**Maine** 10:18,19,24

**maintained** 51:10

**make** 6:17 9:10 10:2 33:12 35:19 40:22 49:7 53:6 57:12,15,17 58:18 70:22 78:9 85:25 94:14

**makes** 29:10 79:11

**making** 35:9 53:4 85:12

**male** 21:1 41:19 42:8,9,10 91:22 92:6

**manage** 73:17

**management** 36:7,11 71:19 73:13,14,15,16,18, 22,25 74:8 79:5

**manual** 56:18 58:15,16,17 59:6 62:25 64:16,17 65:12,13,19 71:5

**marked** 4:6 56:23

**match** 62:21

**materials** 53:14,

16

**math** 17:2

**Matteo** 5:5,18 7:8 65:20 76:23 77:18

**Matthew** 84:25

**maximum** 44:24, 25 45:2,3

**meaning** 6:5 91:16

**means** 15:11

**meant** 6:13

**medical** 17:24 18:20 37:22 41:25 42:1,2 45:12,14, 16,18,21 46:9,11, 12,18,20,25 47:1,6 48:8 91:6

**medically** 80:9

**medication** 53:5

**medications** 45:18

**medium** 44:23

**meet** 60:21

**meeting** 60:20 61:23

**mentioned** 18:6, 11 55:7 59:16

**met** 61:5 62:2

**mind** 14:6

**minimize** 19:5 54:19

**minimum** 44:23 54:10

**minute** 82:16

**minutes** 33:3 48:13 55:10 88:3, 10 90:4

**mischaracterizes** 49:9 65:6

**misheard** 21:18

**misrepresented** 87:11

**missing** 65:3

**mitigating** 26:4,7

**mix** 62:21

**mode** 89:14

**model** 79:22

**moment** 5:2 6:22 24:21 36:24 51:12

**Monday** 9:23

**monitoring** 22:1

**month** 28:18

**monthly** 28:18

**move** 42:14,21 78:12

**moved** 14:3 17:6 90:5

**movement** 76:12 85:10

**movements** 85:12

**MT1** 76:11

**municipal** 12:13

## N

**NA** 19:22

**naked** 27:13,14

**names** 13:13

**Narcan** 37:20

**narcotic** 47:12

**narcotics** 38:18 46:3 50:11 84:7 88:1 95:17

**Nate** 46:13 65:7

**National** 11:1

**nature** 8:25 24:9 39:8 55:1

**necessarily** 18:21 19:1,25 80:2

**needed** 16:19

**newly** 58:8

**newsworthy** 31:13

**nice** 6:14 56:24

**night** 8:20

**nod** 6:4,12,14

**nodding** 6:3 91:9

**nods** 6:6,11

**non-dane** 59:11

**normal** 85:15

**Nos** 4:5

**notes** 38:3

**noteworthy** 28:4

**noticing** 93:22

**notified** 27:24,25

**number** 19:21 25:1 29:11 30:22 37:14 52:13 57:9 62:22 83:10,12,23 94:24

**numbered** 80:14

**numbering** 64:19

**numbers** 64:20 93:24 94:12 95:4,6

**nurse** 42:2

## O

**oath** 4:3

**object** 5:19 12:7 15:9,18 20:13 24:2 25:21 30:23 37:16 38:24 39:23 46:7 48:22 49:8 50:1,13 51:2 52:25 55:4 65:5 71:8 74:5,16 79:24 81:5 86:13, 23 88:5 89:15,16 92:9,10,12 95:18

**objection** 5:23 26:25 32:16 37:24 62:9 84:9 86:18 88:21 93:5,19

**observe** 71:11

**observed** 40:18 85:12 87:11 90:5,9

**observer-type** 55:17

**observing** 20:23

**obvious** 93:11

**occur** 12:6 29:8

**occurred** 27:19 28:4 29:7 81:8 82:19

**occurs** 45:14 61:3,4

**OD** 95:15

**office** 4:14,18,20 7:14 8:7 56:18

**officer** 9:18,20,25 10:2,4 12:2 16:3,7 22:14 29:24 33:5,9 34:17 38:11 40:16 55:15 78:15,25 79:1,3,4 80:6 86:9

**officers** 17:20 18:18

**OIC** 10:7,8 16:8 17:10 25:12 27:8, 21 28:16 30:7,13 32:22 36:25 39:12 61:14 62:3

**older** 43:17,18 44:19

**open** 12:22

**operations** 63:16

**opiates** 55:6

**opioid** 93:25

**opioids** 54:25

**opposed** 32:15

**order** 55:9

**out-of-county** 83:19

**overdose** 37:1,11

**overdosed** 37:15

**overdoses** 52:11 94:16,21 95:1,3

**override** 45:1

**oversee** 9:25

**OWI** 22:2

## P

**P-O-R-T-E-R** 4:12

**p.m.** 74:24,25 75:1 80:24 81:3,11,23 82:16 85:6 87:24 90:13,17 96:7

**packaging** 18:5

**pages** 64:17 65:2

pain 86:2

paper 11:6

paperwork 13:13, 20

paragraph 71:15 73:10,11

paragraphs 72:6

paraphernalia 40:17

part 23:18 28:11, 17 32:2 41:19 56:5 64:15 71:13 80:15

pass-through 61:8,10

passed 28:5 61:10

pat-down 13:6 14:14 19:15 20:6,7 23:16 26:13 41:3 66:21 85:22 86:9 87:16,25 88:13,15, 17,20 89:11

pat-downs 26:11

Paul 77:25 80:19

Payne 11:10 37:1, 7 80:17 86:6 87:15

Payne's 11:19

pending 7:18

penicillin 46:23

people 13:22 14:13 21:13 24:20 26:18 35:10 41:19 44:16,17,22 50:8, 16 59:9 69:5,6 73:23 74:1,12,13 95:11 96:1,3

perceive 5:23

percent 33:25 34:4 93:9

Perfect 96:5

performed 31:18 35:11 70:10 72:16

period 16:8 17:1, 11 62:3 94:17

periods 74:23

permission 67:17 70:10

permitted 69:20

person 11:24 13:7,21 14:9 16:12 17:18 22:5 24:11 27:14 29:25 30:4 33:20 35:6 38:7,9 40:7,14 46:2 48:13 54:15,22 55:17 58:4 66:23 67:5,18 68:11 69:3 70:1 71:3 73:21 75:5 78:3 79:9 80:7

personal 26:15

persons 57:22 58:8 68:24

perspective 61:19

phenomenal 5:10

phones 17:17

phonetic 76:2 85:11 90:21

photographs 14:2

physical 80:9

physically 16:13, 14,23 66:23

piece 11:6

place 13:25 25:7 82:18 90:11

places 41:18

pockets 41:3

pod 43:22,25 45:7 85:8 90:1,22 91:18

pods 43:9,13,14, 24 44:3,4,8,11,20, 23

point 13:3,9 14:6 46:11 82:24

police 12:2

policies 24:9 50:4, 5 60:15 65:8 86:25

policy 20:21 23:6, 20,25 49:21,23 50:24 54:12,14 58:9,11,14 59:6 62:15,17,24 63:1, 3,9,22,23,24 64:21 65:11,13 67:25 69:14 70:4,21 71:14 72:5,6 73:11

popping 48:17

population 42:3

port 12:15,22 14:13 20:6 24:22 35:25

Porter 4:2,12 6:12

portion 20:22 59:5 66:10

posed 8:1

position 8:5 9:15 10:11 35:6 76:7

positive 47:25 80:21

possessing 39:19 54:3

possession 38:18 39:13 84:7

possibly 15:23 21:2 22:19 41:1

post 10:14 11:2 94:13

post-search 28:23

potential 62:12

potentially 18:2, 10

powers 71:10

practices 86:25

pre 94:13

pregnant 23:13, 22

prepared 29:22 30:9,14 84:17,24

preparing 30:2

present 16:13 45:20 93:16

presented 56:17 87:8

presume 18:19 64:15,24 81:10,20

presumes 82:2

presuming 51:25 52:1

presumption 82:22

pretty 18:3

prevent 15:11 18:9 93:7

preventing 15:24

previously 4:5 35:7 45:23 46:21 66:9,14 80:14

primary 52:7

principle 50:25

prior 8:7,8,9 9:5 15:15 16:1 20:11 23:17 25:6,11,18 26:21 27:18 30:16 31:19 34:14 37:4,8 39:21 42:11 45:23 46:5,18,21,24 47:2,5 54:9 63:22 65:3,17 82:4,19,24 83:3

prison 25:12 44:14 68:23

prisoner 23:12 32:1,14,15 33:23 35:25 53:12 91:6

prisoners 24:23 25:8,13,19 57:24 58:2,9,12,14 68:13

prisoners' 27:10

privacy 24:10 50:15 54:14,21

private 55:21 90:3,6

privilege 32:6,11

privileges 15:3 18:14,15 96:4

probation 11:25 12:4 21:20,22 22:25 23:24 38:6 42:23 45:11 46:17 47:16 48:6,10,12 50:19 70:13 83:19 91:10

problem 7:15 45:21 75:20

procedurally 72:24

procedure 14:7,8

procedures 67:2

proceedings 4:1

96:7

process 12:10 13:25 16:12 19:2 46:11 57:24

processed 74:14

processes 18:8

produced 57:15 65:6 66:2

production 65:17

professional 89:2

profiling 35:8

program 22:1

programs 19:21, 24

promoted 76:6,9

pronounced 78:21

proper 13:24 33:2

property 81:2,10, 15,22 82:9 83:4,8

property's 82:1

protect 52:21 54:7

protection 44:18

proverbial 36:2

provide 48:10 61:18 65:11,18 95:4

provided 36:16 41:10 53:19 65:1,8 66:14 75:4 76:24 77:15 80:14

providing 65:12 74:17

public 43:11 44:8 58:5 69:10 85:7

pupils 40:6 80:7

purchase 15:15, 16,20 53:23 54:4

purchased 14:23 15:7,8,10

purchasing 54:1

purpose 29:8,18 67:15,21

purposes 7:23 35:8 36:4 67:21

**put** 6:10 7:8,11 18:18 36:22 56:24 57:13,14 86:20 91:10

**putting** 7:5 70:24

**Q**

**qualify** 28:13

**query** 29:11 36:14

**queryable** 29:5 34:24 35:4 37:13

**question** 5:9,16, 18,20,22 7:3,10, 18,20,25 16:1 19:6 32:3 33:8 39:8 64:1 71:8 91:12 92:4,11,15

**questionnaire** 45:16 46:19,25 47:3,9

**questions** 5:12 11:20 45:17 96:6

**quicker** 42:15 43:5

**quickly** 77:9

**quotes** 69:18

**R**

**R-E-I-S-E-R** 87:20

**radiation-type** 23:15

**raised** 10:20

**random** 47:18,24 48:3

**rationale** 23:25 50:7,15 54:9 60:19 61:2 88:18

**read** 68:10 73:10 86:16

**reading** 53:14,16 72:2,3 84:12

**realistic** 93:9

**realize** 5:18

**rearrested** 22:3

**reason** 5:16 7:13 15:8 19:9 39:2,10,

**20** 40:11,21,24 48:7 55:25 87:24 88:1,8,11 89:12 95:10

**reasonable** 22:11 28:20 33:19 41:7 71:21

**reasons** 39:6 52:13 65:21

**recall** 5:3 65:8

**recently** 11:17

**recess** 66:6 92:2

**record** 66:5

**records** 9:6 17:8 36:6,10 81:13,19 94:16

**recover** 26:18 40:19

**recovered** 40:14, 23,25 94:9

**rectum** 26:22 27:5

**rectums** 27:10,12

**red** 57:1

**redacted** 64:25

**reduced** 65:1

**reduction** 94:6,12

**redundant** 52:19

**reentry** 19:24

**refer** 10:5

**referring** 73:16 91:21

**reflection** 94:1

**reframe** 5:21 16:1

**REGINATO** 12:7 15:9,18 20:13 24:2 25:21 26:25 30:23 32:16 37:16,24 38:24 39:23 46:7 48:22 49:8 50:1,13 51:2 52:25 55:4 62:9 65:5,25 71:7 74:5,16 77:3,7,11, 20 79:24 81:4,16 84:9 86:12,22 88:5,21 89:15 92:9 93:5,19 95:18

**regular** 45:2

**Reiser** 87:20

**related** 73:4

**relates** 39:17

**release** 15:3 21:14

**relief** 18:15

**relying** 13:5

**remanded** 52:9

**repeat** 25:15 28:10 92:15

**rephrase** 7:7,8 25:17 31:1 46:15 49:12

**report** 28:22,23 29:4,14,22,25 30:2,4,13 81:6 84:16,24 86:15,17 87:8,10 89:1 91:1

**reported** 82:20,23

**reporter** 5:10,11

**reports** 11:14 30:9 87:5 88:24 95:6,9, 20

**reproduction** 55:20

**request** 22:20,22, 23 38:15 65:10 94:14 95:2

**require** 29:4

**required** 37:21 58:6,19,22 59:1,3, 5,21,23 60:1,2

**requirement** 58:20 59:22

**requirements** 72:20

**requires** 72:18

**rescinded** 49:24

**resource** 10:1

**respect** 24:10 50:15 54:13

**respond** 60:7

**response** 6:23 7:2,24 65:7,9

**responsibilities** 76:15

**responsibility**

**52:**7,21 54:18

**responsible** 53:6

**result** 31:11,15 37:11 52:12 53:11 94:6

**resulting** 68:7 95:3

**results** 58:11

**resuscitated** 37:20

**return** 15:4,6

**returning** 60:17, 19

**revealed** 80:20

**review** 31:6

**revised** 49:24

**rights** 24:10 54:14,21

**risk** 19:6 61:20

**road** 6:11 48:3

**roster** 75:8 76:19, 24

**roughly** 17:2 30:22 43:22 44:6 81:14

**routine** 29:17 35:16

**routinely** 45:8

**rude** 6:9

**rules** 5:6 41:12

**run** 17:5

**S**

**sadistic** 35:9

**safe** 25:2 58:2 92:20 93:1

**safety** 43:11 44:8 54:16 55:25 56:3 58:5 71:19 72:14 73:12 74:9,20 85:7

**saliva** 47:13

**sally** 12:15,21 14:13 20:6 24:22 35:25

**same-sex** 56:7

**sanctions** 21:24

**satisfied** 13:19

**satisfy** 72:20

**scan** 23:21

**scanned** 88:23

**scanner** 14:21,24 23:12,15,19 24:5, 6,13 34:14 94:3,7, 11,13

**scanners** 14:19 15:6,16,17,21 25:7,11,18 27:18 30:16 31:19 54:10 93:15 95:23,24

**scene** 86:5

**schedule** 75:8

**school** 10:14,21

**screen** 48:8 50:10 56:9,14 75:18

**screened** 47:12

**screening** 45:12, 15

**scroll** 64:10 75:25 76:24

**scrotum** 27:10

**scrutinize** 22:22

**search** 12:19,23 13:3,6,11,23 14:9, 12,14,15 18:8 19:16 20:12,14,17, 25 21:8 22:4,7,10, 21,24 23:16 24:6, 8,13 26:21,23 27:3 28:17 29:4,5,10, 16,21 30:1,3,5,12 31:2,7,10,14 33:1, 7,11,15 34:2,11, 12,21,22,25 35:11 38:16 39:3,6,11,21 40:22,25 41:3,8 54:11 55:9,10 58:4,8,10,20,21,23 59:4,18,25 60:2,5, 6,11,12,13,14 61:3,4,12,13 62:16 66:21,22 67:3,5, 10,16 69:18 70:2, 8,24 71:20,21 72:15,24 73:8 79:13,22 80:20

84:15 86:9 87:19, 23 88:2,9,11,12,19 89:14,24 90:1,8, 11,14,16

**searched** 18:21, 25 19:7,25 23:2 24:11 25:20 31:22 33:25 38:7,9,19 54:15 57:23 60:16 68:13,15 80:24

**searches** 26:10, 12 27:9,17 29:12 30:8,17 34:16 35:3 36:11,12 45:5 55:14 56:7 57:21, 24 58:9,12,14 63:1,2,19,21,23 65:4 66:15 67:4 70:4,7 71:14,23 72:4,19,21 73:4,9

**searching** 16:24 21:17 26:16 29:1 54:23

**secondary** 11:2

**seconds** 82:13

**section** 57:20,21 58:19 63:3,17,19 67:3,7,14,15,21, 22,24 68:2,5

**secure** 13:24

**security** 4:15,23 11:23 19:10 24:15 36:2 44:23 49:13 54:16 63:16 71:19 72:15 73:13 74:9, 20 75:13,14,20

**seeking** 35:16 36:3

**segregation** 42:4

**semantics** 19:20

**send** 65:24

**sense** 40:22 57:17

**sentence** 21:24 32:2 83:17

**sentenced** 20:15 21:12,15,19,21,23 22:5,7 23:5 33:13, 16,23 34:3,9 47:18 50:20,21 58:23 83:16

**separate** 63:23

64:20

**September** 4:24 8:5

**sergeant** 8:21 16:19 30:2 38:13, 14

**sergeants** 16:17

**series** 13:12

**serve** 21:24

**services** 4:15,23 8:15 9:7 11:23 49:14 75:12,13,14, 20

**serving** 22:1

**set** 44:20

**shady** 71:3

**shaking** 40:8

**Shannon** 11:10, 19 87:15

**share** 8:19 56:9

**shared** 75:18

**Shaun** 76:1

**sheriff** 49:16,22

**sheriff's** 4:14,18, 20 8:6 11:7 12:1 52:22 56:18

**shift** 9:18,20,23 10:6,7,8 16:4 28:2, 4,6 31:6,7,8,17 34:18,19 74:22,24, 25 75:1 85:4

**shifts** 16:17 74:23

**short** 16:11 43:6 72:6

**shortly** 65:13

**shots** 53:7

**show** 11:21 48:21 56:8,13 66:8,10 72:2 75:2 77:23

**showed** 82:17

**showing** 66:8 69:21

**side** 18:19 44:2 70:25

**sign** 50:3

**signature** 42:19

**significance** 14:16

**significant** 11:15 41:24

**signing** 49:22

**similar** 24:14

**similarly** 44:20

**simple** 43:6 57:9

**sir** 66:11

**sister-in-law** 6:6

**sitting** 7:20 74:4

**skinny** 91:4

**skips** 77:1,13

**slider** 12:22

**slightly** 14:10 37:12 68:17 75:24

**Smith** 34:17

**smooth** 56:13

**snuck** 17:12

**someone's** 26:22

**sort** 28:22 31:2 32:21 34:20 36:1 37:22 50:24 53:22

**sought** 79:13

**source** 95:16

**Southern** 10:18, 24

**speak** 61:7 88:9

**specific** 10:3 29:9, 10 41:16 54:3 57:11 69:23 71:15 72:10,12,22 93:23

**specifically** 19:7 21:23 23:7 47:19 49:13 53:18 60:12 72:23 73:5,6 94:22,24

**speculate** 94:2

**speculating** 89:25

**speculation** 27:1 30:24 38:25 48:22 49:10 55:5 74:17 80:1 88:6 89:16 92:11 93:20 95:18

**speculations** 32:17

**spell** 4:10

**spelled** 78:20

**split** 43:25 44:1,3

**spoke** 66:3

**spot** 47:8

**squad** 12:16,18

**stabbing** 51:18

**staff** 41:21 42:2 45:16 46:9,13,20 47:1 48:8 51:19 52:2,8 54:2 57:14 58:3 59:12 91:6 92:22,23

**stamp** 66:14 82:6, 12

**standing** 85:16 86:18

**start** 5:11,12,17,20 12:11 28:25 29:1 31:8 94:25

**starting** 66:14

**starts** 65:15 76:25

**state** 4:10 83:19

**stated** 91:8,16

**states** 81:6

**statistics** 32:21 34:14,20 35:20 37:13,22 38:1

**status** 32:2 33:14

**statute** 68:17,18, 19 69:15

**stay** 42:25

**staying** 42:14 43:7

**stays** 47:2

**stealing** 39:16

**steps** 12:6

**sticker** 56:24,25

**stole** 38:21

**stop** 5:21 93:9

**straight** 23:3,7 50:22

**street** 12:12 13:10 20:24 21:4 45:19 46:3

**strip** 19:15 20:12, 14,17,25 21:8,16 22:4,7,10,21,24 23:1 24:6,8,12 26:16,21,23 27:2, 3,8,16,22 28:17 29:3,5,11,16,21 30:1,3,5,8,12,17 31:2,7,10,14,22 33:1,7,11,14,24 34:2,11,12,16,21, 22,25 35:3,10 36:11 38:7,9,15,19 39:2,6,11,20 40:22,24 41:8 54:11 55:9,14 58:7,20,21,23 59:4,17,25 60:2,4, 6,12,14 61:2,3 62:16 63:2,21,23 66:22 67:3,5,10,16 68:13,15 69:18 70:7,8,24 73:8 79:12,22 80:19 84:15 87:19,23 88:2,9,11,19 89:13,23 90:1,7, 11,14,16

**strips** 31:18

**strong** 55:1 70:13

**stuck** 9:10

**stuff** 11:4,5 19:11

**stupid** 69:7,10

**style** 43:25

**styles** 43:24

**subject** 12:13 13:16 14:11 56:5 67:5 72:4

**subjects** 20:16

**subsequently** 30:14 35:21

**substances** 84:2

**succumb** 95:14

**suffering** 90:23

**suggest** 80:10

**suggesting** 90:4

**supervision** 10:5 49:19

**supervisor** 22:21, 22 28:1 33:18 41:6 49:15 59:3,24 60:4 67:17 70:11 89:23 93:16,17

**supervisors** 10:3 16:16 28:6,23 39:25

**supervisory** 76:15

**supplied** 54:1

**supplies** 62:6

**support** 9:6 71:24 74:8

**supposed** 92:25

**surrounding** 12:4

**suspicion** 22:11

**suspicious** 33:19

**sweat** 40:9

**switch** 66:9 75:2, 21 77:17,18

**sworn** 4:3

**system** 18:4 35:4 36:6,7,11,23 47:21 48:2 50:12 64:19 92:7 95:11

**T**

**T-SHIRT** 21:2

**table** 63:14 64:5

**takes** 13:25 82:18 90:11

**taking** 7:15 45:19

**talk** 66:18

**talked** 70:1 92:17

**talking** 30:18 46:9, 10,12 72:14,25 90:20 92:21

**talks** 69:25 85:3

**taping** 51:8

**target-rich** 19:13

**Tarkenton** 77:25 80:19 82:3,17 84:15 85:11 87:16 88:17,19 90:14 91:4,7,8,16

**Tarkenton's** 81:15

**tasked** 92:19

**team** 76:12 79:5

**technically** 16:10

**telling** 57:11

**tells** 60:4 70:22 78:4

**temporary** 14:3 41:20 45:6

**ten** 73:23 74:1,12

**tend** 57:13

**tended** 44:18

**term** 43:6 58:22 59:5

**terms** 14:8 23:20 33:10 34:15 35:20 37:14 39:2,6,10 44:21 49:19 59:17 66:20 84:21 94:16

**test** 47:13,14,24, 25 49:2 50:10

**tested** 47:12 80:21

**testified** 4:4 71:9

**testify** 86:19

**testing** 47:18

**thick** 64:16,18,23

**thing** 6:25 14:16 51:14 83:15

**things** 6:19 8:24 18:25 19:3 21:7 36:13 39:7 40:6 42:20 45:20 55:1 67:14 69:7 72:17, 22 82:18 92:19

**thought** 75:18 90:18

**three-and-a-half** 9:4

**three-page** 78:2

**throw** 68:18

**time** 14:18 16:3,7 17:1,6,9,11 20:1 25:15 27:8 29:21 30:12,19 31:21,23 33:25 34:4 36:24 47:4,10,22 48:20

**55:12 57:17 59:23 60:1,20 62:3,25 72:25 73:7 74:8,23 81:14 82:6,12 86:1 90:21 92:15 94:17

**timeframe** 29:13

**times** 9:12 18:4 30:18 36:16 55:22 72:24

**titled** 29:4

**titling** 29:8,9

**today** 14:11,17

**told** 59:8 71:5 89:10 91:6

**topic** 72:19 73:8

**topics** 73:3

**total** 43:13

**tox** 50:10

**track** 57:15

**traditional** 23:16

**train** 72:21 73:2

**trained** 73:6 80:6

**training** 11:3 39:4 71:4 72:18 80:12

**transaction** 40:19

**transcript** 4:1 5:13 6:10,17

**transport** 12:16

**transported** 90:3

**transsexual** 44:19

**treat** 23:8 50:22, 23,25

**trigger** 80:3

**troublemakers** 44:17

**true** 6:2 32:7,8 52:23,24 53:3,12, 13 54:6 62:8 78:19 81:20

**truthful** 84:21 87:6

**TSA** 24:15

**turn** 6:16 51:12 61:17 62:15 69:24 87:9 90:25

**turned** 60:10

**Turning** 36:24

**twos** 76:8

**Tylenol** 53:17,23, 25 54:2

**type** 13:15 18:25 27:13 28:12 36:12 42:7 43:4,18 45:20 50:25 55:22,23 72:22

**typed** 6:20

**types** 19:22 21:7 42:20

**typical** 74:23

**typically** 18:23 41:18 45:4,14 55:18 76:7

**U**

**UA** 48:3

**uh-huh** 6:15,23 63:18 70:16

**uh-uh** 6:15,24

**unclear** 57:12

**understand** 74:11

**understanding** 11:16,18

**understood** 6:21 7:25

**underwear** 21:2,7 26:17

**uniform** 13:22 20:8,11,12,25 21:3

**uniforms** 26:14

**unit** 73:18

**University** 10:18

**unsecure** 13:2

**unsentenced** 20:16 22:24 23:8,9 33:13 50:17,23 51:1

**unusually** 56:4

**upcoming** 5:23

**updated** 50:5 62:20 66:18

**uploaded** 66:1

**urinalysis** 47:18

**urine** 47:25

**usage** 48:20 54:8

**utilize** 15:5

**V**

**variety** 4:19 19:3 45:17 73:3

**vary** 24:24 72:19

**vehicle** 12:15,16, 21 14:13 91:10

**vendor** 17:24 19:12

**vendors** 17:23 18:6,11,19 19:1, 14,20,21

**venture** 33:3

**verbal** 6:23 7:1

**verbiage** 63:4

**verifying** 81:12

**versa** 5:13 46:23

**versed** 51:4

**version** 57:13 65:1

**versus** 33:13

**vice** 5:13 46:23

**Vick** 85:10

**video** 5:8,11 51:7 55:19

**videos** 51:10

**view** 55:20 89:21

**violation** 38:6 48:2

**visible** 27:12,14

**visitation** 18:7,11 60:24

**visually** 27:15

**volunteer** 47:23

**volunteers** 19:23

## W

**W-I-E-S-T** 91:1

**waiting** 42:20
73:22 74:12

**walk** 11:22 12:18

**wanted** 11:15
36:16 37:7 59:7
76:18 80:14 94:19

**ways** 17:15 18:1
92:24

**weapon** 22:16

**weapons** 13:7
17:16 22:12 33:21
51:16 58:1 92:21

**weekly** 30:17,22
32:24

**weeks** 43:7

**well-being** 52:8

**white** 91:5,15

**widely** 24:24

**Wiest** 91:1,5

**wing** 44:16

**wings** 44:15

**withdrawal** 95:15

**withdrawals**
90:23 91:8

**witnessing** 89:3

**Wonderful** 10:21

**wondering** 59:20

**work** 5:1 15:3
18:14 21:14 28:7
47:23 59:14

**work-release**
96:4

**worked** 8:22
76:18

**worker** 76:14,17

**working** 34:15
59:12 76:8,13 85:7

**worry** 70:19

**worthy** 5:19

**wow** 5:4

**write** 86:15

**writes** 84:21

**written** 67:17
70:10

**wrong** 6:3 17:14
20:5 32:9 68:1,10

**wrote** 38:5

## Y

**year** 4:24 9:16
22:2 72:20

**years** 4:19 8:7 9:4
10:12,13 16:4
28:15 46:1

**yes'** 6:8,16

**yesterday** 85:19

## Z

**Zoom** 21:18 56:12