IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ESTATE OF SHANNON J. PAYNE,
by its Special Administrator Christopher
Meisel,

                      Plaintiff,

    v.

DANE COUNTY, SHERIFF DAVID
J. MAHONEY, ABC INSURANCE
COMPANY, and JOHN DOES 1-20,

                Defendants.

OPINION AND ORDER

20-cv-512-wmc

---

Not unlike the ubiquitousness of drug abuse in society as a whole, despite what has now been a fifty-year, so-called "war on drugs," prisons and jails have been unable to eliminate the abuse of prescription and illicit drugs within their walls. This is so despite the proliferation of decades-old state and federal laws criminalizing both the smuggling and abuse of drugs within prisons and jail, also not unlike new and stiffer penalties for drug distribution and use in society more generally. *E.g.*, 18 U.S.C. § 1791; 34 U.S.C. § 12522 (enhancing penalties for smuggling into, supplying or using drugs in federal prison); Wis. Stats. § 961.495 (criminalizing possession or attempted possession of a controlled substance on or near, *inter alia*, Wisconsin jails or correctional facilities); Cal. Penal Code § 4573; Fl. Stat. § 951.22; Ill. Crim. Code Art. § 31A; Tex. Penal Code § 38.114. If anything, the challenges of restricting access has only increased with the increased addictive quality of many illicit drugs, the challenges of managing the misuse of prescription medications, crowding, understaffing, and temptations for underpaid staff and vendors, among other reasons.

In this case, following a drug overdose while incarcerated at the Dane County Jail, Shannon J. Payne passed away on December 27, 2016.  His estate brings this lawsuit against the County, its former Sheriff David J. Mahoney, and a number of John Doe officers under 42 U.S.C. § 1983, alleging that defendants acted with deliberate indifference in violation of the Eighth Amendment in failing to protect him from use of illegal drugs. Defendants have moved for summary judgment, offering several grounds for judgment in their favor.  (Dkt. #21.)  Notwithstanding defendants' constitutional obligations to protect Payne and all others in their custody, the court agrees that plaintiff has failed to put forth sufficient evidence from which a reasonable jury could find against them.  Accordingly, the court must grant defendants' motion and direct entry of judgment in their favor

UNDISPUTED FACTS[1]

## A. Payne's Overdose

At the end of December 2016, Shannon Payne was serving time at the Dane County Jail.  On December 27, 2016, he went to the restroom with another inmate, Paul Tarkenton, who both apparently used illegal drugs.  Payne then suffered an overdose.  The initial report of an inmate having fallen in the bathroom and experiencing a possible seizure was made at 2:10 p.m.  Shortly thereafter, Payne was taken to the hospital.  Tragically, he died two days later on December 29 from complications due to his overdose.

Among other things, defendants maintain that it is unknown:  when the drugs Payne ingested on December 27 were smuggled into the Jail; who smuggled them in; how they

---

[1] Unless otherwise noted, the following facts are material and undisputed when viewed in the light most favorable to plaintiff as the nonmoving party.

were smuggled in; and whether Tarkenton or Payne possessed the drugs used in the bathroom.  Plaintiff purports to dispute all of this based on deposition testimony of Kerry Porter, the current Captain of Security Services and the Jail Administrator and a Lieutenant during the events giving rise to this lawsuit, who had reviewed an investigation report by Detective J. Wiest.  In turn, Wiest's report describes statements made by an unidentified inmate, who reported that Tarkenton told him that he smuggled heroin into the Jail upon his booking on December 26, 2016 -- just one day before Payne's overdose.  (Pl.'s Resp. to Defs.' PFOFs (dkt. #32) ¶ 4.)  As defendants point out, Captain Porter's testimony is based on at least three levels of hearsay.  Nevertheless, as discussed below, plaintiff put forth other evidence from which a reasonable jury might conclude that Tarkenton is responsible for smuggling in the drugs that Payne used on December 27.

### B.  Tarkenton's Movement and Behavior

Specifically, Tarkenton was booked into the Jail in the afternoon of December 26, 2016, the day before Payne's overdose.  Tarkenton's booking documents indicate that he was charged with possession of heroin and was placed a probation hold from prior convictions.  Those documents also noted that his speech was slurred.  As detailed more fully below, video footage also shows that Tarkenton was searched three, separate times as part of the intake/booking process.  Initially, he was patted down immediately after he arrived at the Jail.  Next, a deputy observed Tarkenton change out of his street clothes into a jail uniform, then searched his street clothes.  Finally, Tarkenton was patted down again after he changed into his jail uniform.  After booking, Tarkenton was placed in the Jail's "bullpen," which is a non-housing unit and generally used for inmates undergoing the

booking and screening process.  At some point after lunch service on December 27, Tarkenton was then moved to Pod 4C, where Payne and others were housed.

Plaintiff relies on deputy incident reports to fill in the subsequent events surrounding Payne's overdose.  (Pusick Decl., Ex. 3 (dkt. #33-3).)  While these reports constitute hearsay, the court will assume for purposes of summary judgment that the officers who prepared the reports would testify consistent with them.  *See Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) ("The evidence need not be admissible in form, but must be admissible in content, such that, for instance, affidavits may be considered if the substitution of oral testimony for the affidavit statements would make the evidence admissible at trial.").[2]

After Payne was taken to the hospital, other inmates informed deputies that an inmate on bunk 13, initially referred to as the "new guy" and later identified as Tarkenton, had taken something and was acting strange.  After observing Tarkenton, Deputies Matthew Earll and Michelle Vick approached and instructed him "come off of his bunk." (Pusick Decl., Ex. 3 (dkt. #33-3) 6.)  However, when Tarkenton tried to sit up, the officers observed him "making quick jerking motions with his arms and head."  (*Id.*)  The deputies then escorted him to segregation for medical observation, during which Tarkenton reported that he had taken heroin the day before entering the jail.  At that point, Deputy Earll apparently conducted a pat down search without finding anything.

Shortly after Payne's overdose, at approximately 2:50 p.m., officers strip searched Tarkenton based on a suspicion that he had contraband on him.  Deputy Deibele

---

[2] Even with this assumption, the officers' reports contain hearsay within hearsay, whose admissibility is more problematic but is being included for context favorable to plaintiff.

conducted that strip search, discovering a "bit of paper towel or toilet paper between inmate Tarkenton's buttocks area and his groin area." (*Id.* at 3.) Deibele instructed Tarkenton to remove the contraband and upon inspection, uncovered a small plastic baggie containing a white powdery substance, which tested positive for heroin.

On December 28, Deputy Wiest conducted an interview with another inmate, Michael Crawford, who reported that Tarkenton had said he had a "hit or two" of heroin on him when he arrived in the pod on December 27. (*Id.* at 19.) Tarkenton also purportedly said that he had already taken some in holding before being transferred to the pod and then asked Crawford to make sure he did not fall off the top bunk. After witnessing him almost fall, Crawford next told an unidentified deputy that Tarkenton had probably taken something because he was concerned about Tarkenton falling off the bed and hurting himself. (*Id.*)[3] While inmate Crawford apparently did not identify the specific deputy he spoke to, another report by Deputy Michelle Vick states Crawford told her that Tarkenton was "sick" or "withdrawing from something" at approximately 2:35 p.m., after Payne's overdose. (*Id.* at 18.)

## C. Description of Activities Based on Video Footage

On the same day as Payne's overdose, December 27, Deputy J. Torres was also directed to review and preserve video footage of inmate Tarkenton due to a drug

---

[3] Another inmate interviewed as part of the investigation, Wayne Graves, saw Tarkenton's use of drugs, but only *after* Payne overdosed, when others were watching "the commotion in and around the bathroom area." (Pusick Decl., Ex. 3 (dkt. #33-3) 32-33.)

investigation following a suspected drug overdose.[4]  Torres started with the footage of Tarkenton being brought into the Jail at approximately 4:20 p.m. on December 26.  In recounting Tarkenton's activities, Torres noted an interaction between Tarkenton and another inmate at approximately 6:40 p.m. on the 26th, causing Torres to suspect that the inmate "had gotten some type of drug from Tarkenton which made [the inmate's] behavior change dramatically."  (Pusick Decl., Ex. 3 (dkt. #33-3) 22.)  In a subsequent interview, however, that inmate denied exchanging anything with Tarkenton; plus, the inmate's urine sample tested positive for THC, not opiates.

In continuing to review the video for the rest of the 26th and into the morning of the 27th, Torres noted instances where Tarkenton's movements seemed "slow," losing his balance at times, and "appeared disoriented."  (*Id.*)  Then, at approximately 12:40 p.m. on the 27th, Tarkenton is escorted into the pod where Payne is also housed.  Next, Tarkenton is seen going into the restroom several times, including at approximately 12:59 p.m., when Payne is seen going in as well.  Both inmates are in the restroom for approximately four minutes.  At 1:20 p.m., Tarkenton is next seen sitting at the phone station, and Torres again notes abnormal behavior, including his nodding off, rubbing his hands, and at one point, his upper body rapidly fell forward, hitting his forehead on the phone panel.  Tarkenton then moves to his bunk while struggling to maintain his balance and holding onto the bunk.  At 1:49 p.m., Payne approaches Tarkenton, and they talk for a few minutes, after which Payne returns to the dayroom.

---

[4] Based on plaintiff's reliance on Torres's report, defendants submitted three CDs of Tarkenton's actual movement and actions during the relevant period.  (Dkt. # 41.)  While defendants clarify certain aspects of Torres's report based on those CDs, they do not contend that the video itself is materially different from Torres's report of the videos.  As such, the court relies primarily on Torres's report, which plaintiff relies upon for its description of the relevant facts at summary judgment.

At 1:52 p.m., Payne again approaches Tarkenton and talks to him for about five minutes.  At 1:57 p.m., Tarkenton retrieves something from under his mattress, after which Payne and Tarkenton walk into the dayroom, then Tarkenton proceeds to the restroom with Payne following.  At approximately 2:04 p.m., Tarkenton walks out of the restroom into his bunk area.  Payne exits at 2:09 p.m., walks over to his bunk, drapes a towel over his shoulder, and appears to be holding hygiene items.  After retrieving a chair from the phone station, Payne again returns to the restroom.  Tarkenton also enters the restroom again at 2:10 p.m.

Torres next provides details regarding the actions of deputies, medical staff and EMS with respect to Payne who had apparently collapsed in the restroom.  As for Tarkenton, around 2:14 p.m., in the midst of the deputies responding to Payne, Torres describes Tarkenton returning to his bunk, pulling a blanket over his knees, putting his hands under the blanket, and then "appeared to be handling something with his hands while Deputies and medical staff were in the restroom." (*Id.* at 24.)  At approximately 2:29 p.m., Tarkenton begins behaving oddly, moving his body slowly, leaning backwards and staring at the ceiling, then jerking forward.  He also apparently nodded off several times.  At 2:33 p.m., deputies next escort Tarkenton off his bunk and out of the pod.

Defendant does not dispute that Tarkenton's recorded behavior was abnormal throughout and that his actions were consistent with being high on opioids, but point out that all of this was discovered during the investigation, *not* observed or known to deputies during the events giving rise to this lawsuit.

### D. Search Policy

Policy 603.04 governed "Searches of Inmates" in effect at the Jail in December 2016.  The Policy includes descriptions of various searches, including frisk/pat down search, full/custodial search, strip search and body cavity search.  (Porter Aff., Ex. 1 (dkt. #25-1) 13.)  The Policy requires frisk/pat down search to be conducted on all inmates before the booking process, while the inmate is still handcuffed, and also states that this type of search could be conducted "at any time for any reason when [an inmate] is housed or moving within the jail facility."  (*Id.* at 14.)  The Policy also states that a full/custodial search, which requires an inmate to remove clothing except for underwear, is to be conducted on all inmates during intake/booking, unless the inmate remains in the booking area during his or her stay.  (*Id.* at 14-15.)

The Policy also authorizes strip searches to be conducted under certain circumstances.  In particular, if the inmate has not been sentenced, then a strip search may be conducted only with permission from a supervisor if certain conductions were met.  If the inmate has been sentenced, then a strip search could be conducted at any time.  Material to plaintiff's claim, this type of search involves visual inspection of the anus.  The Policy also states that body cavity searches may be conducted "if there is reason to believe the inmate is concealing contraband or evidence in a body cavity."  (*Id.* at 437.)  A body cavity search further requires advanced *written* approval from a supervisor and must be conducted at a medical facility by a licensed medical provider.

Consistent with these policies, current Dane County Jail Administrator Captain Kerry Porter, testified that the decision to conduct a strip search on an unsentenced inmate like Tarkenton depends on whether the deputy has a reasonable suspicion that the person

may be concealing contraband.   In explaining the Searches of Inmates policy, Porter described its implementation as a "balancing act" between the "privacy and dignity of the person being searched" and the "safety and security of the jail."   (Defs.' Resp. to Pl.'s PFOFs (dkt. #39) (quoting Porter Dep. (dkt. #34) 54).)[5]

## OPINION

Defendants seek summary judgment on varied grounds, some of which simply fail to align with plaintiff's claims or theories of liability as pleaded -- most notably defendants' argument on qualified immunity.   On the other hand, plaintiff unhelpfully argues its deliberate indifference claim based on the actions of officers generally, neither naming any individual who had personal involvement with the circumstances surrounding Payne's overdose as defendants, nor detailing individual actions or inactions in a way to ground its claim of deliberate indifference.   Even more problematic, because plaintiff may only pursue a *Monell* claim against the County, plaintiff's scattershot approach describes policies, but fails to provide evidence or law rendering them constitutionally suspect.   Similarly, plaintiff alludes to a lack of training without explaining how this caused the alleged constitutional violation here as a matter of fact or law.   With those initial comments aside, the court will attempt to address the parties' various arguments while explaining why the tragic events surrounding Shannon Payne's death, even when viewed in the light most favorable to his Estate, fail to support plaintiff's claim of deliberate indifference under the Eighth Amendment.

---

[5] Defendants also describe other policies and training requirements, but, as far as the court can discern, plaintiff's claim is focused on the County's Policy with respect to searches and strip searches.

## I. Claims against Doe Defendants

As detailed in the caption above, plaintiff named John Does 1-20 in its complaint. At the preliminary pretrial conference with Magistrate Judge Crocker, the court set a deadline of October 16, 2020, to amend the pleadings and name or otherwise identify these Doe defendants.  The parties thereafter submitted a motion seeking to extend this deadline, which the court denied, but in doing so later reminded plaintiff that it could still seek leave to amend consistent with Federal Rule of Civil Procedure 15(a)(2). (Dkt. ##14, 18.)  Nonetheless, plaintiff failed to seek amendment of its pleading or otherwise attempt to name any additional individual as a defendant.

Because 42 U.S.C. § 1983 necessarily requires a showing of personal involvement, *see Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010), plaintiff can no longer pursue its claims generally against unidentified "defendants," as it is apparently attempting to do in its opposition brief on summary judgment, which is the "put up or shut up" time for any party with the burden of proof. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021).  As such, the court agrees with defendants that any claims against Doe defendants are dismissed as a matter of law.[6]

---

[6] Plaintiff utterly fails to respond to this portion of defendants' motion; instead, it simply argues in its opposition brief that "defendants" violated Payne's rights.  Even if plaintiff were to attempt to seek leave now under Rule 15(a) to name specific individuals as defendants, such a motion would have to be denied at this stage of the lawsuit for undue delay, if not undue prejudice. *See Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008) ("[C]ourts in their sound discretion may deny a proposed amendment if the moving party has unduly delayed in filing the motion, if the opposing party would suffer undue prejudice, or if the pleading is futile.").  Since plaintiff has not even moved to amend, however, the matter is essentially moot at this point.

## II. *Monell* Liability

At this point then, plaintiff's only claim is against the two, named defendants -- Dane County and its former sheriff, David J. Mahoney.  Moreover, to the extent plaintiff seeks to assert a claim against Mahoney in his individual capacity, it has similarly failed to put forth any evidence to demonstrate his required personal involvement.  *See Minix*, 597 F.3d at 833.  As such, plaintiff's only possible claim against Mahoney is an official capacity claim, which practically speaking is the same claim asserted against the County itself.  *See Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) ("Grieveson's claims against the Sheriff in his official capacity are treated as claims against Marion County itself.").

Accordingly, to demonstrate liability against either defendant, plaintiff must put forth sufficient evidence from which a reasonable jury could find:  (1) a violation of his constitutional rights; *and* (2) that defendants' policy, custom or practice caused the constitutional violation.  *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994); *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 692 (1978).

### A. Constitutional Violation

Because it is undisputed that Shannon Payne was a convicted inmate at all relevant times, the Eighth Amendment governs his estate's failure to protect claim.  *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017).  Payne's status as a convicted inmate, rather than a pretrial detainee, matters because convicted prisoners generally need to show under the Eighth Amendment that the defendant intentionally harmed them or acted with deliberate indifference toward a risk of harm to them.  *Kingsley v. Hendrickson*, 576 U.S. 389, 396-400 (2015).  In other words, to prevail on its claim, plaintiff must prove by a

11

preponderance of the evidence both that Payne faced a "substantial risk of serious harm" *and* jail officials acted with "deliberate indifference" to that risk. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

In bringing a motion for summary judgment, defendants principally argue that "[a] plaintiff cannot prove an Eighth Amendment violation if the inmate willingly participated in the conduct that caused the injury." (Defs.' Opening Br. (dkt. #38) 2.) In support, defendants cite to decisions from other federal circuits, save one in which the Seventh Circuit upheld the grant of summary judgment to defendants based on finding that a softball field's "protrusive lip" was not the type of objectively serious risk protected by the Eighth Amendment. *Christopher v. Buss*, 384 F.3d 879, 882 (7th Cir. 2004). In so holding, the Seventh Circuit touched on what amounts to *dicta* regarding the voluntary aspect of that plaintiff's actions:

> Moreover, Christopher himself explains in his complaint that the defendants "invited" him to play softball—an invitation he accepted voluntarily. That Christopher chose to play further derails his theory that prison officials failed to protect him from harm. A prison official's duty to protect an inmate from harm arises because the state has placed him "under a regime that incapacitates [him from] … exercise[ing] ordinary responsibility for his own welfare." *See County of Sacramento v. Lewis*, 523 U.S. 833, 851, 118 S. Ct. 1708, 140 L.Ed.2d 1043 (1998). Far from being unable to exercise responsibility for his own welfare, Christopher, like any cautious ballplayer outside of prison, was free to examine the playing field for what he now characterizes as an apparent defect. *Cf. Haas v. Weiner*, 765 F.2d 123, 124 (8th Cir. 1985) (*per curiam*) ("[C]onduct in which one voluntarily engages can hardly be said to violate the Eighth Amendment."). Prison officials' failure to alert him to its existence, although perhaps negligent, cannot be equated with the "unnecessary and wanton infliction of pain." [*Hudson v.*] *McMillian*, 503 U.S. [1, 5 (1992)] (citation and internal quotations omitted).

*Id.* at 882-83.

Setting aside whether this language in *Christopher*, as well as in decisions from other circuits cited by defendants, is binding, plaintiff responds *all* such decisions involved voluntary actions "that the institution permitted and anticipated the inmate to participate in -- not based on activity that is strictly forbidden and unforeseeable." (Pl.'s Opp'n (dkt. #30) 9.) Moreover, whatever the importance of this distinction, the Seventh Circuit has found other, similar "voluntary actions" (most prominently acts of self-harm), nevertheless trigger the protections of the Eighth Amendment. *E.g.*, *Collins v. Seeman,* 462 F.3d 757, 761 (7th Cir. 2006); *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001). As such, the court agrees with plaintiff that the arguably voluntary nature of Payne's drug use does not serve as a basis for finding that his Eighth Amendment claim fails as a matter of law. *See generally DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 ("[W]hen the State takes a person into its custody and holds [him] there against [his] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [his] safety and general well-being.").

Defendants also argue that plaintiff's claim fails because it lacks sufficient evidence to support a finding of deliberate indifference. "A 'deliberate indifference' violation has two components, one objective and one subjective." *Balsewicz v. Pawlyk,* 963 F.3d 650, 654 (7th Cir. 2020), *as amended* (July 2, 2020). "The objective component is that the prisoner must have been exposed to a harm that was objectively serious." *Id.* (citing *Farmer*, 511 U.S. at 834. "The subjective component is that the prison official must have known of and disregarded an excessive risk to the inmate's health or safety." *Id.* at 654-55 (citing *Farmer*, 511 U.S. at 837-38; *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020)).

13

"Specifically, the official must have been 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and he must have 'draw[n] th[at] inference.'" *Id.* at 655 (quoting *Farmer*, 511 U.S. at 837).

Defendants do not dispute that Payne's use of drugs presented an objectively serious risk of harm.  Instead, defendants seek summary judgment on the basis that "there is no evidence to prove a member of [the Jail's] staff subjectively knew Payne was at risk, let alone a substantial risk, of smuggling, using, or obtaining drugs during his incarceration, or of interacting with Tarkenton to smuggle, use or obtain drugs for personal use."  (Defs.' Opening Br. (dkt. #22) 11.)  As an initial observation, plaintiff's claim is premised on Tarkenton having been the one who smuggled in the drugs that Payne used, and as detailed above, plaintiff has put forth sufficient evidence from which a reasonable jury could so find.  The more difficult hurdle for plaintiff is whether any Dane County Jail officers or other personnel were subjectively aware of the risk that Tarkenton posed at the time or that inmates pose to each other more generally.

On this point, plaintiff does not identify any specific individuals with such subjective awareness, but instead argues that "officers" should have had a reasonable suspicion that Tarkenton posed a substantial risk of harm to other inmates.  In particular, plaintiff points to evidence that Tarkenton was high while in jail, including that "[i]mmediately after Tarkenton arrived at the Dane County Jail, several inmates reported Tarkenton appearing to be either on drugs or seriously withdrawing from drug use."  (Pl.'s PFOFs (dkt. #31) ¶ 29.)  As support, plaintiff cites pages 11 to 13 of the incident reports prepared by Dane County.  From the court's review of these pages, however, no reasonable

trier of fact could find that other inmates were aware of Tarkenton's drug use before Payne's collapse, much less that any officers were.

To the contrary, page 11 merely recounts Deputy A. Tilleson's interview with an inmate named Lins. Tilleson specifically asked Lins if he "was aware of any drugs in the pod," or if he knew anything about Tarkenton, to which he responded "no" to both questions. (Pusick Decl., Ex. C (dkt. #33-3) 11.) On page 13 of the report, Deputy Kamran Hasan also reported that inmate Wayne Graves referred to Tarkenton going "to [the] back of the bunk row [and doing] two deep snorts while all guys were there by [the] bathroom." (*Id.* at 13; *see also id.* at 32-33 (providing same account to Detective Torres).) However, as reported, this would necessarily have been during the time of, *not* before, Payne's overdose.[7]

Moreover, as noted, the dispositive question is whether defendants' *officers* were aware of Tarkenton's drug use *before* Payne's overdose. In fairness, if Tarkenton's actions were so obvious that a number of inmates noticed his behavior, perhaps a reasonable jury could conclude that officers should have been aware as well, but the evidence does not support a finding. Alternatively, plaintiff argues that "observations" of drug use supposedly made by inmates "were also made by Deputies as a review of the footage shows." (Pl.'s PFOFs (dkt. #31) ¶ 30.) For support, however, plaintiff cites to the same pages of the incident reports, none of which refer to any deputy reporting observations of Tarkenton's drug use or signs of drug use before Payne's overdose.

---

[7] Similarly, as described above, inmate Michael Crawford also reportedly witnessed Tarkenton's unusual behavior and reported it to an unidentified deputy out of concern that he may fall out of his bunk. While Crawford does not identify the deputy, a report by Deputy Michelle Vick states Crawford told her that Tarkenton was "sick" or "withdrawing from something" at approximately 2:35 p.m., which was also *after* Payne's overdose. (Pusick Decl., Ex. C (dkt. #33-3) 18.)

15

Of course, in Torres's report of his careful review of the videos showing Tarkenton's activities based on video footage, he saw *some* evidence of Tarkenton's use, but his observations are so subtle -- simply noting his lack of balance, odd movements and certain movements of his hands, at times underneath a blanket -- and made with the benefit of hindsight focused on Tarkenton's mannerisms, but none of his observations would support a reasonable finding that officers could or should have detected Tarkenton's being on drugs in the moment, much less that any were reckless in not observing or reacting in real time. Indeed, plaintiff's own expert conceded that "[i]n the materials I reviewed for the report, I found no such reports from individual deputies of their observances of Tarkenton prior to the incident." (Landers Rept. (dkt. #35) 14-15.)  Finally, having failed to *identify* an individual Dane County Jail officer who was personally, subjectively deliberately indifferent, no reasonable juror could find that an officer abused his or her discretion or otherwise was deliberately indifferent to the threat posed by Tarkenton.

## B.  Policy, Custom or Practice

Having rejected any theory of liability based on an individual officer's failure to recognize the threat posed by Tarkenton and then conduct a strip search (or otherwise address possible drug contraband in his possession), plaintiff's only theory of liability would appear to be based on the Jail's search policies, and in particular, on the County's reliance on an officer's discretion in determining the appropriate level of search upon intaking a new detainee.  As to this claim, plaintiff argues that "Dane County procured an express policy regarding the importance of strip searches as consistent with Department of

Corrections guidance but chose to employ a personalized approach in everyday practice."
(Pl.'s Opp'n (dkt. #30) 26 (citing Pl.'s PFOFs (dkt. #31) ¶ 47).)

As factual support, plaintiff points to its expert Brian Landers' report, opining that
Dane County's Policy only requires patting down on the outside of clothing.   More
specifically, Landers cites to Sec. 603.7, which he represents reads as follows:  "A full search
will involve thoroughly patting down the individual's body on the outside of the clothing."
(Landers Rept. (dkt. #35) 17.)  Landers represents further that "Wisconsin's training on
conducting searches in a jail setting define a 'custodial search' as more intrusive to remove
the clothing with [the] except[ion] of bra and underwear."  (*Id.* (citing POSC Manual
Wisconsin Training and Standards, 2015, at p.66).)  From this, Landers opines that "[a]
reasonable person would assume that a person being booked into a county jail would have
a 'custodial search' completed and not a simple 'pat down,' especially with the emphasis
that Dane County has expressed in its policy that searches are done to ensure safety and
eliminate contraband."  (*Id.*)

As an initial observation, it is not at all clear to what Dane County Jail policy
Landers is referring in rendering this opinion.  From the court's review of the policies
attached as Exhibit 1 to the declaration of Kerry Porter, there is no Policy 603.7 that
concerns to searches.[8]  Instead, as discussed above, the policy concerning searches is found
at 603.04, and expressly requires full/custodial searches for all new arrests, with certain
exceptions that do not apply here.  Furthermore, such a search requires the removal of

---

[8] Rather, Policy 603.07 concerns security checks and refers to visual observations, but there is *no*
mention of searches.  (Porter Aff., Ex. 1 (dkt. #25-1) 27-28.)

clothing, except for underwear, and further provides that the search "can be accomplished when a staff person of the same sex observes an inmate 'change over' into a jail uniform." (Porter Aff., Ex. 1 (dkt. #25-1) 13, 15.)

Regardless, as detailed above, there is no dispute that Tarkenton was both patted down *and* subjected to a full/custodial search, requiring him to remove his street clothes while an officer observed. Landers' report fails to explain how this full/custodial search was inconsistent with the existing Wisconsin guidance on which his opinion relies, nor otherwise plainly inadequate or constitutionally suspect.[9]  Thus, plaintiff's argument that Tarkenton was "only subjected to a simple pat-down upon his entry into Dane County" is not supported by the record.  (Pl.'s Opp'n (dkt. #30) 27.)

Landers also opines that "Dane County officials would have been justified in performing a strip search due to the nature of the arrest (for felony possession of heroin), and Tarkenton being a known drug user by his probationary status." (Landers Rept. (dkt. #35) 18.)   However, Landers stops short of opining that the Policy's treatment of sentenced versus non-sentenced inmates is deficient or otherwise criticizing the Policy itself.   Instead, in Landers' view, Dane County officers would have had reasonable suspicion to conduct a strip search.  For the reasons described above, however, plaintiff again fails to identify any individual officer who acted with deliberate indifference in failing to recognize and manage the risk posed by Tarkenton.  In other words, Landers' opinion on this issue does not reflect a defect in any Dane County Jail Policy, custom or practice;

---

[9] In support of this argument, plaintiff also points to the deposition testimony of Captain Porter, in which he describes annual training on the topics of searches, which may include "when is a good time to use your discretion." (Porter Dep. (dkt. #34) 72-73.)  However, there is nothing about this testimony that would support a reasonable jury finding that the Dane County Policy of searches is constitutionally inadequate.

rather, he is simply criticizing an unidentified officer's exercising judgment in how to conduct a search.

### C. Deliberate Indifference to Training and Supervision

Plaintiff also appear to argue that the County was deliberately indifferent in its training and supervision, citing *City of Canton v. Harris*, 489 U.S. 378 (1989). In that case, the Supreme Court explained there may be circumstances in which "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that a municipality can be found liable for a constitutional violation. (Pl.'s Opp'n (dkt. #30) 28.) Whatever its merits, this argument is woefully undeveloped by plaintiff, contending only that "[b]ooking deputies who handled Tarkenton failed to properly search him prior to allowing him into the facility." (*Id.* at 29.) As described above, however, Tarkenton *was* subjected to a full/custodial search as that term is defined by Policy 603.04. In light of that, any theory based on a failure to train or supervise fails; instead, the undisputed record demonstrates that the officers followed policy. And to the extent plaintiff is again relying on an individual officer's discretionary decision to forgo a strip search, the court cannot evaluate that argument without reference to a specific officers' knowledge about the relative risks presented by Tarkenton.

For all of these reasons, the court finds that plaintiff has failed to put forth sufficient evidence from which a reasonable jury could find either a constitutional violation by an individual defendant or that a constitutional violation was caused by a policy, practice or custom, including lack of training.

### III. State Law Claims

Finally, in its complaint, plaintiff asserts state law claims for failure to train, supervise and discipline and loss of society and companionship. Whether the latter claim is a separate cause of action or simply a request for relief is unclear, but defendant moves for summary judgment on all of plaintiff's state law claims for failure to comply with Wisconsin Statute § 893.80(1d)(a). That provision requires written notice of a claim against a governmental body within 120 days of the event giving rise to the claim. Given that Payne's overdose occurred on December 27, 2016, plaintiff was required to submit the necessary notice by April 26, 2017. Instead, plaintiff submitted the notice on December 18, 2019, almost three years after the event. (Pusick Decl., Ex. D (dkt. #33-4).)

Having disposed of all federal claims for which it has original subject matter jurisdiction, the court would ordinarily decline to exercise supplemental jurisdiction over these remaining state claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissal all claims over which it had original jurisdiction."); *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) ("[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (quoting *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994)) (alteration in original).

However, plaintiff's obvious failure to comply (or even substantially comply) with the notice requirement serves as a sufficient basis for the court to grant summary judgment to defendants on the state law claims as a matter of judicial efficiency, sparing a state court

from having to review the same argument.  *See Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501–02 (7th Cir. 1999) (approving of district court retaining jurisdiction over and deciding state law claim where "the resolution of [plaintiff's] state law claims was clear and it would have been pointless to return this case to the Indiana courts").  As such, the court will also dispose of those claims.

One final note.  In granting summary judgment to defendants, the court in no way means to diminish the tragic events surrounding Payne's overdose and death.  Of course, it is awful that heroin was smuggled into the jail, and as a matter of public policy, the Jail should do all it can to restrict, if not eliminate, the presence of any unauthorized drugs within its walls.  However, on this record, plaintiff has failed to put forth sufficient evidence or develop a theory that would support a finding that Payne's constitutional rights were violated or that the County was somehow liable for any violation of the Eighth Amendment.

## ORDER

IT IS ORDERED that:

1)  Defendants Dane County, David J. Mahoney, ABC Insurance Company and John Does 1-20's motion for summary judgment (dkt. #21) is GRANTED.

2)  The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 11th day of April, 2022.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

21